Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed January 6, 2004

Division No. 94-1

IN RE: MADISON GUARANTY SAVINGS & LOAN
(LEWINSKY FEE APPLICATION)

———

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

———

Before: SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges.*

## O R D E R

It is ORDERED by the Court, *sua sponte*, that the opinion filed herein on December 30, 2003, be and it hereby is, amended as follows:

Page 4, line 24, substitute "half of the" for "a majority of."

*PER CURIAM*

For the Court:

Mark J. Langer, Clerk

By:

Marilyn R. Sargent
Chief Deputy Clerk

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Filed December 30, 2003

———

Division No. 94-1

IN RE: MADISON GUARANTY SAVINGS & LOAN
(LEWINSKY FEE APPLICATION)

———

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

———

Before: SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges*.

———

**O R D E R**

This matter coming to be heard and being heard before the Special Division of the Court upon the application of Monica Lewinsky for reimbursement of attorneys' fees and costs pursuant to section 593(f) of the Ethics in Government Act of 1978, as amended, 28 U.S.C. § 591 *et seq.* (2000), and it appearing to the court for the reasons set forth more fully in the opinion filed contemporaneously herewith that the petition is not well taken, it is hereby

**ORDERED, ADJUDGED,** and **DECREED** that the petition of Monica Lewinsky for attorneys' fees that she incurred

2

during the investigation by Independent Counsel be denied.

PER CURIAM
For the Court:
Mark J. Langer, Clerk
By:
Marilyn R. Sargent
Chief Deputy Clerk

Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Filed December 30, 2003

Division No. 94-1

IN RE: MADISON GUARANTY SAVINGS & LOAN
(LEWINSKY FEE APPLICATION)

————

Division for the Purpose of
Appointing Independent Counsels
Ethics in Government Act of 1978, As Amended

————

Before: SENTELLE, *Presiding*, FAY and REAVLEY, *Senior Circuit Judges.*

## ON APPLICATION FOR ATTORNEYS' FEES

Opinion of the Special Court filed *Per Curiam.*

*Per curiam*: Monica Lewinsky petitions this court under § 593(f) of the Ethics in Government Act of 1978, 28 U.S.C. §§ 591–599 (2000) (the Act), for reimbursement of attorney fees that she incurred during and as a result of an investigation conducted by the Independent Counsel (IC). Because we conclude that Lewinsky has not carried her burden of showing that the fees would not have been incurred but for the requirements of the Act, we deny the petition.

### I. Background

On January 16, 1998, Attorney General Janet Reno applied for and this court granted an order extending the jurisdiction of Independent Counsel Kenneth Starr "to investigate . . . whether Monica Lewinsky or others suborned perjury, ob-

structed justice, intimidated witnesses, or otherwise violated federal law ... in dealing with witnesses, potential witnesses, attorneys, or others concerning the civil case *Jones v. Clinton*." The *Jones v. Clinton* case referenced in Attorney General Reno's application and the court's order was a civil suit filed by Paula Jones against then-President William J. Clinton. Jones alleged that during Clinton's term as Governor of Arkansas and while Jones was a state employee, he had solicited sex from her, that she had declined, and that as a result, her state employment had been adversely affected, in violation of her federal civil rights as well as other rights.

Prior to trial, Jones's attorneys sought to discover whether there were other government employees with whom President Clinton had conducted sexual relationships or from whom he had solicited sexual favors. In December 1997, Jones's attorneys subpoenaed Monica Lewinsky, the fee petitioner here, directing her to appear the next month to testify and to produce certain items, including gifts from President Clinton. As the investigation ultimately revealed, Lewinsky, an intern and later employee in the White House, had been having a sexual relationship with President Clinton since about 1995. They had agreed, however, that they would deny the relationship if ever asked about it. In response to the subpoena, Lewinsky in early January 1998 executed an affidavit falsely denying any sexual relationship with the President. Shortly thereafter, Lewinsky accepted a job in the private sector which she was able to obtain with the assistance of a friend to the President, Washington attorney Vernon Jordan. *See In re Madison Guar. Sav. and Loan (Jordan Fee Application)*, 344 F.3d 1250, 1252 (D.C. Cir., Spec. Div., 2003) (per curiam).

Attorneys for Jones also subpoenaed Linda Tripp, a friend of Lewinsky's. On January 12, 1998, Tripp contacted the Office of Independent Counsel (OIC) and advised that office that Lewinsky had told her that she was preparing to file a false affidavit, had and stated her intent to lie if deposed, and had urged Tripp to lie in her own deposition. Unbeknownst to Lewinsky, Tripp had taped conversations between herself and Lewinsky which corroborated the information she presented to the IC. On January 13, 1998, the OIC consensually

monitored a conversation between Tripp and Lewinsky during which Lewinsky offered Tripp a one-half interest in a condominium if Tripp would join her in perjury in the Jones case. The OIC presented this information to the Attorney General.

On January 16, 1998, the Attorney General notified this court that she had commenced a preliminary investigation into whether Lewinsky or others had committed violations of federal criminal law. As a result of that preliminary investigation, she requested an expansion of the jurisdiction of then Independent Counsel Kenneth W. Starr to investigate further and determine whether prosecution was warranted. Referring to the consensually monitored conversation between Tripp and Lewinsky of January 13, 1998, the Attorney General specifically stated to the court "I have also determined that the taped conversation establishes that further investigation of this matter is warranted."

On January 17, 1998, Clinton was deposed in the Jones case. United States District Judge Susan Webber Wright of the District of Arkansas had traveled from Little Rock to Washington, D.C. to preside over the deposition. Despite the Court's orders requiring discovery regarding state or federal employees with whom he had conducted or from whom he had solicited sexual relations, President Clinton during the deposition "by clear and convincing evidence . . . responded to plaintiff's questions by giving false, misleading and evasive answers that were designed to obstruct the judicial process." *Jones v. Clinton*, 36 F. Supp. 2d 1118, 1127 (E.D. Ark. 1999).

In the meantime, on January 16, 1998, the OIC had confronted Lewinsky with evidence of her crimes and attempted to obtain her cooperation in exchange for immunity. Represented, at that time, by attorney William Ginsburg, whom her father had retained in California, Lewinsky rejected the immunity offer.

The investigation continued. Among other evidence, the IC obtained a box of gifts given by Clinton to Lewinsky during the course of their sexual relationship. After receiving the subpoena, Lewinsky had turned the gifts over to Betty Curry, Clinton's personal secretary, who had secreted the gifts in further obstruction of the Jones litigation.

Although Lewinsky had rejected the proffered immunity on January 16, 1998, Lewinsky's attorneys, William Ginsburg and Nathaniel Spates, first attempted to negotiate an immunity agreement then spent months attempting to enforce in court an immunity agreement that they claimed had been struck. The District Court for the District of Columbia, then-Chief Judge Norma Holloway Johnson presiding, rejected that claim. *See In re Sealed Case*, 144 F.3d 74 (D.C. Cir. 1998) (per curiam) (dismissing appeal on jurisdictional grounds). Shortly thereafter, Lewinsky dismissed attorney Ginsburg, retained Plato Cacheris of Washington, D.C. as her lead counsel and also added attorney Jacob Stein. Within two months Lewinsky's new attorneys were able to negotiate full transactional immunity for Lewinsky in exchange for her agreement to cooperate with the investigation. They entered into an agreement on July 28, 1998. Lewinsky prays fees for legal services rendered both before and after the entry of the immunity agreement.

As a result of the evidence of perjury, subornation of perjury, and obstruction of justice, the House of Representatives voted to impeach President Clinton on December 19, 1998. On February 12, 1999, following trial on two articles of impeachment, the Senate voted on whether to remove Clinton from office. Although half of the Senators voted for removal, the vote fell short of the two-thirds' concurrence necessary for conviction of President Clinton.

The IC concluded that the basic allegations against President Clinton were substantiated and that sufficient evidence existed to prosecute him. Final Report of Independent Counsel at 19–20, 23, 28–29, 32–34, 41–43. However, rather than seeking an indictment of the President, the IC entered into an agreement with Clinton whereunder the departing President admitted his responsibility, accepted professional discipline from the Arkansas Bar, and agreed not to apply for any counsel fees in relation to this investigation. Under an agreement with the Arkansas Bar, Clinton agreed that he "would accept a five year suspension, pay[ ] a $25,000 fine (as legal fees for the [Arkansas Committee on Professional Conduct's] outside counsel) and formally acknowledg[e] a viola-

tion of one of the Arkansas Rules of Professional Conduct." Letter from David E. Kendall, private counsel to President Clinton, to Robert W. Ray, Independent Counsel (Jan. 19, 2001) (quoted in Final Report of Independent Counsel at 19).

Pursuant to the agreements with the IC and the Arkansas Bar, Clinton admitted:

> A. That he knowingly gave evasive and misleading answers in violation of Judge Wright's discovery orders, concerning his relationship with Monica Lewinsky, in an attempt to conceal from plaintiff Jones's lawyers the true facts about his improper relationship, which had ended almost a year earlier.

> B. That by knowingly giving evasive and misleading answers, in violation of Judge Wright's discovery order, he engaged in conduct that is prejudicial to the administration of justice in that his discovery responses interfered with the conduct of the *Jones* case by causing the court and counsel for the parties to expend unnecessary time, effort, and resources, setting a poor example for other litigants, and causing the court to issue a thirty-two page Order civilly sanctioning Mr. Clinton.

Based upon Clinton's admissions, the Supreme Court of Arkansas ruled that he had committed professional misconduct and "engag[ed] in conduct that was prejudicial to the administration of justice." Agreed Order of Discipline at 3–4, *Neal v. Clinton*, No. Civ. 2000–5677, 2001 WL 34355768 (Cir. Ct. of Pulaski Co., Ark. Jan. 19, 2001).

Lewinsky now petitions the court for attorneys' fees in the amount of $1,165,390.97 that she states she incurred during the IC's investigation of this matter.

## II. Analysis

### A. The Requirements of the Act

Unique in the criminal law structure of the United States, the Ethics in Government Act provides for reimbursement of attorneys' fees expended by subjects in defense against an

investigation under the Act. Specifically, 28 U.S.C. § 593(f)(1) states:

> Upon the request of an individual who is the subject of an investigation conducted by an independent counsel pursuant to this chapter, the division of the court may, if no indictment is brought against such individual pursuant to that investigation, award reimbursement for those reasonable attorneys' fees incurred by that individual during that investigation which would not have been incurred but for the requirements of this chapter.

Because the Act "constitutes a waiver of sovereign immunity it is to be strictly construed." *In re Nofziger*, 925 F.2d 428, 438 (D.C. Cir., Spec. Div., 1991) (per curiam). Under the Act, therefore, we can only order reimbursement for attorney fees when we determine that: (1) the subject of the IC investigation, (2) incurred the fees during the investigation, and (3) would not have incurred them "but for" the requirements of the Act. *See, e.g., In re Pierce (Kisner Fee Application)*, 178 F.3d 1356, 1358 (D.C. Cir., Spec. Div., 1999) (per curiam). In addition to these three elements, the fee applicant must also establish that the fees are reasonable. *See, e.g., In re Meese*, 907 F.2d 1192, 1201–03 (D.C. Cir., Spec. Div., 1990) (per curiam). In light of our disposition of the pending application on the basis of the elements already listed, we will not herein reach the question of reasonableness.

B.   The Subject Requirement

While the whole of Lewinsky's fees will be disallowed for failure to meet the "but for" requirement of the Act, we would not reach that question if she did not qualify under the subject requirement for at least a portion of those fees. As we have noted frequently in the past, the Act does not define "subject," but our precedents establish that for purposes of the fee reimbursement provision a subject of an IC's investigation is a person

> whose conduct is within the scope of the independent counsel's investigation and . . . who knew at the time of

incurring the fees sought in the petition that his conduct was within that scope in such a fashion that the independent counsel might reasonably be expected to point the finger of accusation at him.

*In re North (Applications of Shields and Gruner)*, 53 F.3d 1305, 1307 (D.C. Cir., Spec. Div., 1995) (per curiam) (citations and internal punctuation omitted). Both the IC and the Attorney General, for whose comments on the Lewinsky application we are grateful, agree that Lewinsky was a subject for a part of the time for which she claims fees. That portion of the time begins with our grant of jurisdiction on January 16, 1998, and extends through July 28, 1998, the date on which the OIC granted her transactional immunity.

Although she claims that she was a subject and entitled to reimbursement until February 12, 1999, the date on which President Clinton was acquitted in the impeachment trial, we disagree. After the grant of transactional immunity, it was no longer reasonable to expect that the IC might point the finger of accusation at her. As we have previously stated, "as a general proposition . . . an immunized witness will no longer be a 'subject.'" *In re North (Dutton Fee Application)*, 11 F.3d 1075, 1079 (D.C. Cir., Spec. Div., 1993) (per curiam).

Lewinsky contends that her case falls outside this "general proposition." In support of her argument, she relies on our decision in *In re North (Cave Fee Application)*, 57 F.3d 1117 (D.C. Cir., Spec. Div., 1995) (per curiam), which held that the fee petitioner therein retained "subject" status even after being granted use immunity because such immunity did not protect him from being prosecuted as a result of information independently derived from other witnesses, *id.* at 1120. Lewinsky claims that she too did not lose her subject status after being granted transactional immunity, arguing that "she remained a subject because her immunity was conditional and she remained under continuous threat of prosecution." In support of this argument, Lewinsky asserts that regardless of her immunity, she could still be prosecuted for giving false testimony or for speaking publicly about the case. She further claims that the IC threatened to withdraw her immu-

nity if she did not cooperate with the impeachment proceedings of the House of Representatives. According to Lewinsky, her immunity agreement was "far more demanding, being conditioned on a set of unusual requirements, and contained far more dire consequences for Ms. Lewinsky than the immunity agreement in *Cave*." She sums up her argument here by claiming that for her "there remained a realistic possibility that she could become a defendant even after the grant of immunity." We disagree.

The petitioner in *Cave* had obtained only a grant of *use* immunity pursuant to the Federal Use Immunity Statute, 18 U.S.C. § 6002. Such a grant "confers immunity only against the use of testimony compelled under the immunizing order; 'it does not confer transactional immunity under which the witness could not be prosecuted at all for the transactions about which he testifies.'" *Id*. at 1120 (quoting *Dutton*, 11 F.3d at 1078–79). The OIC in this case granted Lewinsky *transactional* immunity which prevented the OIC from prosecuting her so long as she abided by the terms of her immunity agreement. Therefore, as of the time she signed the agreement, her status was that of witness, not potential defendant. In *Dutton*, we held that even the grant of use immunity is generally sufficient to remove the reasonable likelihood of prosecution. On the special facts of the Cave application we held that a reasonable possibility of prosecution remained even in the face of the use immunity. In the case of transactional immunity it is highly unlikely, if not impossible, that the recipient, such as Lewinsky, would ever be prosecuted absent some act totally within her own control in breach of the immunity agreement.

Therefore, only the earlier portion of Lewinsky's fees are considered for reimbursement. However, for reasons set forth *infra*, even those fees do not survive analysis under the "but for" test.

C. The "But For" Test.

As stated, we can award only "those reasonable attorneys' fees incurred by [a subject of the investigation] during that investigation which would not have been incurred but for the

requirements of" the Act. 28 U.S.C. § 593(f)(1). Lewinsky argues that in cases such as *In re Donovan*, 877 F.2d 982 (D.C. Cir. 1989) (per curiam), and *Dutton*, *supra*, we have awarded fees where we have found that a professional or politically appointed prosecutor would not have pursued allegations similar to those investigated by an IC, and that her case falls within that category. She asserts that perjury allegations such as those against her would not have been pursued by the Department of Justice had they not been "part of a broader inquiry of the President of the United States" and at best "would have generated a cursory or summary nonpublic investigation by the Department of Justice." In other words, she asserts that her claim for fees meets the "but for" test because there would have been no investigation of her conduct had it not involved the President.

The IC in her evaluation of Lewinsky's fee petition first takes issue with Lewinsky's claim that the DOJ does not investigate perjury and obstruction of justice, stating that in fact "the Department routinely prosecutes perjury and obstruction cases and is willing to do so for perjury in civil cases and even when those cases settle." But the IC argues that in any event it is of no consequence in the "but for" discourse how rare a certain type of prosecution is "if it is shown, as it has been here, that that type of offense would be and has been prosecuted by the Department of Justice if and when it occurred."

The IC further argues that Lewinsky's claim that the investigation of her was overly thorough and intrusive does not satisfy her burden of showing that the requirements of the Act caused her to incur attorneys' fees. Lewinsky's reliance on *In re Nofziger* is misplaced, according to the IC, because the court in that case concluded that the fee reimbursement provision of the Act was intended for instances in which covered officials were investigated "for criminal offenses for which ordinary citizens would not have been investigated or prosecuted," 925 F.2d at 444, whereas here the criminal offense investigated was perjury for which ordinary citizens are routinely investigated and prosecuted.

Additionally, the IC argues that Lewinsky's comparison of her situation to that of an "ordinary citizen" is not appropriate. The IC cites *In re Babbitt (Babbitt Fee Application)*, 290 F.3d 386, 391 (D.C. Cir., Spec. Div., 2002) (per curiam), in which the court stated that Babbitt, the Secretary of the Interior, could not compare the investigation of himself to an investigation of an ordinary citizen; rather, the comparison would have to be to an investigation of a cabinet officer. The IC notes that the allegations here concerned plans by the President of the United States to commit perjury as well as his involvement in a scheme to provide Lewinsky with a job in exchange for false testimony, and that "[i]t is in the context of the broader allegations of obstruction at the highest levels of government that Lewinsky's situation must be analyzed."

Finally, the IC notes that at the very beginning of the investigation of her the IC offered Lewinsky transactional immunity in exchange for her cooperation. She refused and in the next six months accumulated more than $800,000 in attorneys' fees, after which she successfully negotiated an immunity agreement with the IC. The IC argues that in this regard Lewinsky "cannot show that any requirement of the Act forced these choices upon her."

The DOJ in its evaluation also contradicts Lewinsky's argument here by citing numerous cases that it asserts demonstrate that the DOJ frequently investigates and prosecutes the crimes of perjury and obstruction of justice in civil cases. And the DOJ points out the seriousness of the perjury allegations involving both President Clinton and Lewinsky. Relying on *In re Nofziger*, 925 F.2d at 443–44, the DOJ states that Lewinsky invokes the wrong legal standard for the "but for" test: it is not, as she claims, whether there would have been no investigation of her if her misconduct did not involve the President, but rather whether there would have been a similar investigation "if there had been no Independent Counsel statute *but all other circumstances were the same*." (Emphasis by the DOJ.) After reiterating the allegations of perjury and subornation of perjury that were leveled against Lewinsky and President Clinton, the DOJ asserts that in the absence of the Act it would have conducted a similar investi-

gation and therefore Lewinsky has not satisfied the "but for" requirement because she "has failed to meet her burden of demonstrating that there would have been no investigation of this matter in the absence of the Independent Counsel Act."

We agree with the OIC and the DOJ. Lewinsky asserts that her claim for fees meets the "but for" test because there would have been no investigation of her allegedly criminal conduct had it not involved the President. In making that argument, she applies the wrong legal standard. The language she draws from our prior decisions concerning the possibility of investigation of "private citizens" describe specific applications of the statutory requirement. That statutory requirement is that the legal fees "would not have been incurred by a similarly-situated subject investigated in the absence of the Act." *In re Pierce (Kisner Fee Application)*, 178 F.3d at 1359. In other words, her burden is to prove that she would not have incurred these fees if there had been no IC statute but all other circumstances were the same. *See In re Nofziger*, 925 F.2d at 443–44.

Here, the underlying allegations were that Lewinsky lied under oath in a pending lawsuit against the President of the United States; that she was planning to lie again and had encouraged others to lie; that she had spoken to the President and an associate of the President about the matter; and, at least implicitly, that the President and his associate may themselves have been involved in the wrongdoing. *See, e.g.*, Final Report at 14–15; Referral Order of January 16, 1998; Application to Expand the Jurisdiction of the IC 1–2 (January 16, 1998). As noted, the Independent Counsel ultimately concluded that the basic allegations were substantiated and that sufficient evidence existed to prosecute the President. Final Report at 19–20, 23, 28–29, 32–34, 41–43. Lewinsky has failed to meet her burden of demonstrating that there would have been no comparable investigation of this matter in the absence of the Act.

At most, Lewinsky has established that the investigation would not have occurred had her fellow subject been someone other than the President of the United States, not that the

investigation would have never begun or been aborted early in the absence of the Act. We doubt whether she has established even that; but even if she had, it would not be sufficient. As we stated in *Kisner*, "[her] difficulties were occasioned by [her] being suspected of having done mischief in high company, not by the identity of the authority investigating the allegation of mischief." 178 F.3d at 1361.

We have considered and rejected this same claim not only on parallel facts, as in *Kisner*, and numerous other cases, but on the very investigation before us in this petition. In *Jordan Fee Application*, Vernon Jordan, an associate of former President Clinton, made the same argument that Lewinsky now presents. As we stated in *Jordan*, when the Attorney General made the referral, and when the OIC conducted the investigation generating the fees, each "had credible, indeed compelling, evidence that Monica Lewinsky had committed perjury and was attempting to suborn perjury of others. This was accompanied by other evidence that the President of the United States had committed perjury and had suborned or attempted to suborn others." 344 F.3d at 1255. Like the petitioner in *Jordan*, Lewinsky "offers no reason why any prosecutor in the absence of the Act would not have investigated these serious allegations of criminal wrongdoing as thoroughly as did the Independent Counsel." *Id.* As in *Jordan* and cases cited therein,

> we cannot hold that the Attorney General and other investigative authorities would not have pursued allegations of corruption as deep and widespread as those revealed by the Independent Counsel's investigation had there been no such Act.

*Id.* (quoting *In re Pierce (Olivas Fee Application)*, 178 F.3d 1350, 1355 (D.C. Cir., Spec. Div., 1999) (per curiam)).

In short, the question is: would evidence of criminal wrongdoing by an incumbent President and accomplices of that President have escaped an investigation of similar scope in the absence of the Ethics in Government Act? History

teaches us that the answer is no. The most recent parallel investigation of an incumbent sitting president before the enactment of the Ethics in Government Act arose from the Watergate scandal during the administration of President Richard Nixon. The thoroughness of that investigation is legend. We have no reason to believe that the Department of Justice, the Congress, and other civil authorities would have been any less diligent in the Clinton administration of the 1990's than in the Nixon administration of the 1970's. As in *Jordan*, Lewinsky's petition flounders on the "but for" requirement and we can award no counsel fees.

We note in passing that in *Jordan*, *Clinton*, and other fee application decisions, we have awarded fees for time spent by counsel reviewing the Independent Counsel's Final Report. *See Jordan* at 1255; *In re Madison Guar. Sav. & Loan (Clinton Fee Application)*, 334 F.3d 1119, 1128 (D.C. Cir., Spec. Div., 2003) (per curiam). Lewinsky has made no claim for any such fees and we therefore make no similar award.

### Conclusion

For the reasons set forth above, the petition is denied.