**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 18, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>PUBLISH</u>

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**
_____

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | |
| v. | No. 07-5121 |
| RANDY LEE BALDRIDGE, a/k/a Randy Baldridge, | |
| Defendant - Appellant. | |

_____

**Appeal from the United States District Court**
**for the Northern District of Oklahoma**
**(D.C. No. 06-CR-141-K)**

_____

Jeffrey A. Gallant, Assistant United States Attorney (T. Scott Woodward, Acting United States Attorney and Joseph F. Wilson, Assistant United States Attorney with him on the brief) Tulsa, Oklahoma, for Plaintiff - Appellee.

William D. Lunn, Tulsa, Oklahoma, for Defendant - Appellant.

_____

Before **HARTZ**, Circuit Judge, **HOLLOWAY**, Senior Judge, and **O'BRIEN**, Circuit Judge.

_____

**O'BRIEN**, Circuit Judge.

_____

Randy Lee Baldridge appeals from his conviction on eight counts of

conspiracy, fraud and misapplication of funds by a local government official, mail fraud, money laundering, and corrupt persuasion of a person to obstruct a federal investigation. We affirm.

## I. BACKGROUND

From 2003 through 2006, Baldridge served as an elected county commissioner of Rogers County, Oklahoma (the County). As alleged by the government and found by the jury, Baldridge abused his position as commissioner by engaging in a scheme to file false claims with the County for payment.

A. County Expenditures

The County generally made expenditures through a consistent multistep process. An elected official or department head would generate a purchase order (PO), which contained basic information including the vendor, a description of the work to be performed, and the estimated cost. After the work was performed, the vendor would prepare an invoice and a county employee—the receiving agent—would prepare a receiving report. Both the receiving agent and the individual who prepared the PO were responsible for ensuring the accuracy of the invoices and receiving reports.

The PO, invoice and receiving report were then presented to the Board of County Commissions (the Board) for payment. The Board approved payment of POs at its weekly meeting. Approximately 150 to 200 POs were approved in bulk every week. During the period at issue here, all POs were approved unanimously.

Once payment was approved, a warrant—essentially the equivalent of a check—was issued for payment. It was the County's policy to mail the warrants to the vendors, but vendors could also pick up their warrants in person. When vendors picked up their warrants in person, they were required to sign a register.

B. Bruce Long—the Dog Creek Project

In 2003, Baldridge hired Bruce Long to work as an equipment operator. His duties included cleaning rights-of-way, cutting brush and operating machinery. After approximately six months, Baldridge promoted Long to a first deputy or road foreman. In that role, Long was responsible for overseeing the work of other operators and maintaining the County roads in the district.

In July 2004, work needed to be performed on a section of highway near Dog Creek. Baldridge called two independent contractors to perform the work but one was unavailable and the other gave a quote Baldridge believed was too high. Baldridge asked Long to perform the work. Long expected to be paid approximately $2,090 for the work in addition to his usual salary. Long performed the work using a track hoe rented by the County. After the work was completed, Baldridge instructed Long to find a friend to whom payment could be made to avoid questions regarding favoritism and paying a salaried employee for contract work. Barney Howard, the receiving agent at the time, prepared a PO designating Long's friend, Brad Jones, as the vendor. Baldridge signed the PO on July 26, 2004, though he understood Long, not Jones, performed the work.

-3-

Relying on information from Baldridge, Cindy Rash[1] prepared a false invoice reflecting Jones as the vendor. Howard prepared a receiving report stating Jones had completed 38 hours of work on the Dog Creek project. Long told Baldridge it took him only 24 hours to perform the job but Baldridge insisted it would not look right if he were paid the amount promised for only 24 hours of work.

A warrant in the amount of $2,090.00 was approved by the Board. Baldridge voted to approve the payment without disclosing the hours billed to the County were inflated and it was Long, not Jones, who did the work. The warrant was prepared on August 10, 2004, and mailed to Jones. Jones cashed the warrant and gave the money to Long. Long gave Jones a couple hundred dollars.

C. Brian Rash

In the fall of 2004, Baldridge hired Brian Rash, Cindy Rash's husband, to do some contract labor at the residence of his sister, Sue Baldridge. Randy Baldridge was a part owner of this property. Rash agreed to work for Baldridge for $20 per hour, understanding he would be paid with County funds. Baldridge asked Rash to do this work with his personal tractor because it would not look good for county equipment to be on the property.

On November 30, 2004, Baldridge signed a PO for Rash to perform 80

---

[1] In 2003, Baldrige hired Cindy Rash as receiving agent. Cindy Rash was a friend of Baldridge's sister. Rash was not the receiving agent involved in the Dog Creek Project, though she did prepare the invoice.

hours of contract labor. Cindy Rash prepared the invoice and signed her husband's name to it. She also prepared a receiving report indicating her husband performed 80 hours of labor between November 30 and December 14. A warrant was issued to Brian Rash on December 20, 2004 in the amount of $1,600. Brian Rash picked the warrant up in person. He testified the only work he did for this money was at Sue Baldridge's residence, though part of the work was on a county easement.

Over the course of the next six months, Cindy Rash prepared three more POs relating to her husband's work. On January 11, 2005, Rash was authorized to perform another 80 hours of contract labor. Cindy Rash again filled out an invoice which she signed on behalf of her husband. The receiving report, which was in Cindy Rash's handwriting, stated Brian Rash performed contract labor on seventeen days between January 11 and January 30, 2005. On February 7, 2005 the County issued a warrant in the amount of $1,600 to Rash. This warrant was picked up by one of Brian Rash's employees and endorsed by both Cindy and Brian Rash. Brian Rash admitted the only work he did for this money was at Sue Baldridge's residence. Cindy Rash testified that after one of these warrants was cashed, she gave Baldridge all the money because he told her he needed to "borrow" the money "to pay a bill off." (R. Vol. III at 85). There was no documentation for the loan and Baldridge never paid the money back. A bank employee testified Baldridge deposited $1300 cash into his bank account around

this same period of time.[2]

On April 1, 2005, Baldridge signed another PO for Brian Rash to perform 80 hours of contract labor. Again, Cindy Rash prepared both the invoice and the receiving report showing fifteen days of work from April 2 to April 20, 2005. Baldridge testified he believed Rash was "filling in for one of our contract mowers." (R. Vol. VI at 712.) A warrant was issued for $1,600 on May 2, 2005. The warrant was picked up and endorsed by Cindy Rash. Brian testified the only work he did for this warrant was at Sue Baldridge's residence.

On July 19, 2005, Baldridge signed another PO authorizing Brian Rash to perform 80 hours of contract labor for $1,600. Again, Cindy Rash signed an invoice for her husband and filled out a receiving report indicating he had worked every day from July 19 through August 3, 2005, with the exception of July 31. Baldridge testified he thought Brian was "mowing down in the Inola area." (R. Vol. VI at 713.) The warrant for this work was issued to Brian Rash on August 16, 2005, and was picked up by Cindy Rash and endorsed by her. Again, Brian Rash testified the only work he did for this warrant was at Sue Baldridge's residence.

Baldridge voted to approve payment of the Brian Rash POs without

---

[2] This exchange of funds formed the basis for the money laundering alleged in Count Six. The jury found Baldridge not guilty on this Count. The government does not appeal from that verdict.

disclosing to the Board that Rash performed all the work at Sue Baldridge's residence.

D.  Joseph Bentz

Baldridge was friends with Joseph Bentz and rented a unit in a triplex owned by Bentz.  In the summer of 2005, Baldridge looked after the triplex for Bentz.  During this period of time, Bentz experienced financial difficulty.  Baldridge was aware of Bentz's financial problems and loaned Bentz money periodically.

At issue here, Baldridge offered to help Bentz financially by having him do concrete work on a bridge near where he was living.  On July 22, 2005, Baldridge signed a PO prepared by Cindy Rash authorizing concrete work on the bridge in the amount of $1,700.  Cindy Rash prepared an invoice purporting to be from Bentz, which Bentz signed.  Rash also prepared a receiving report, dated August 1, 2005, indicating the work had been completed, though she never verified the work was done.  Baldridge voted to approve the payment to Bentz without disclosing to the Board that no work was ever performed.

On August 9, 2005, a warrant was issued to Bentz in the amount of $1,700.  Because Bentz was in Texas, Baldridge picked up the warrant and deposited it into Bentz's checking account.  Several days later, Bentz paid his property taxes to Rogers County in the amount of $649.72 and paid Baldridge $700 for looking after for the triplex.  The payment to Baldridge was made by cashier's check with

Bentz listed as the remitter. Baldridge picked up the cashier's check in his name and deposited $600 of it into his bank account approximately twelve minutes after the cashier's check was created.

E. Bruce Long—the Robert Portiss Driveway

In August 2005, the County made plans to pave Ray Davis Road. The work was to be performed by Bellco Materials. Shortly after a PO was approved, Robert Portiss, who lived on Ray Davis Road, contacted Baldridge about having his driveway paved at the same time the road was paved. Baldridge agreed and the price was set at $3,000.

Baldridge instructed Long, who was involved in the project, to have Bellco pave Portiss' driveway with asphalt purchased by the County for Ray Davis Road. Long directed a Bellco employee, Carey Bunker, to pave the driveway. Although it was contrary to Bellco's policy, it paved both the road and the driveway using the asphalt paid for by the County. A Bellco employee testified Bellco received $11,762.55 from the County for the entire project, of which approximately $3,900 was for paving the Portiss driveway.

Baldridge asked Long if Brad Jones could "cash a check" like he had earlier on the Dog Creek Project. Long agreed. Baldridge told Cindy Rash that a friend of his was going to do some work for Portiss. Portiss was out of town when the work was performed. When he returned home he contacted Baldridge to request an invoice. Baldridge directed Cindy Rash to prepare an invoice in the

-8-

name of Brad Jones that billed Portiss for $3,000 for his driveway. Baldridge advised Portiss he should make the check out to "Brad Jones" and provided Portiss with the invoice that had been prepared by Cindy Rash.

Portiss' wife made a check out for $3,000 payable to Brad Jones. Baldridge brought the check to Long in order to have Jones cash it. Baldridge told Long to let Jones "keep a couple hundred dollars of it." (R. Vol. IV at 308.) Long did as instructed and also gave a couple hundred dollars to Carey Bunker. Bunker testified he believed the money was "a tip or hush money." (R. Vol. VII at 453.) Long gave the rest of the money to Baldridge. Baldridge deposited $500 in cash into his personal bank account on September 27, 2005, the day after Jones withdrew the amount of the check from his account.

Baldridge voted to pay the PO to Bellco without disclosing to the Board that part of the work was done on a private driveway and without disclosing he intended to personally benefit from the project.

F. The Investigation

On March 22, 2006, a search warrant was executed at the District 3 warehouse seeking documents relating to the Rashes and the Bentzes. Both Cindy and Brian Rash were interviewed by the FBI and agreed to cooperate with law enforcement and have their calls recorded. During one recorded call, Brian Rash told Baldridge the FBI was coming to talk with him and asked "what do you want me to tell 'em?" (Appellant's Addendum Ex. 49 at 2560.) Baldridge replied "tell

'em that you . . . mowed the northwest of Inola." (*Id.*) When Rash asked whether he should say anything about "working at SUE's house," Baldridge responded: "No . . . you just did that as a friend." (*Id.* at 2561.) He continued: "[J]ust tell 'em that, you know, that you did the work, it would be worse otherwise . . . just pick different times for different roads." (*Id.* at 2561-62, 2563.) Later that afternoon, Baldridge called Cindy Rash and asked whether the FBI had been there yet and: "What did they ask?" (*Id.* at 2565.) Cindy told Baldridge she had not yet talked to her husband and would call him back. Baldridge responded: "[T]hank you . . . it'll all be fine. Consistency is everything." (*Id.* at 2566.)

On March 25, Baldridge and Brian Rash spoke again. Rash told Baldridge he had explained to the agent that he did some work "west of town" "and did some ditch cleaning and stuff like that . . . ." (*Id.* at 2568.) Baldridge responded: "[I]t's okay, but that's, that's what they want to know. They want to know that there's a BRIAN RASH and, you know, that you did do the work." (*Id.* at 2569.) On March 26, Baldridge and Cindy Rash spoke again. Baldridge speculated as to who might be behind the federal investigation.

In late March 2006, shortly after the warrant was served, Baldridge and his friend, Brian Slover, traveled to Texas to visit Joe Bentz and his wife. This trip was not unusual as the two had visited the Bentzes in Texas twice before. Baldridge told Bentz "there was a witch hunt going on, a political witch hunt." (R. Vol. VII at 492.) While in Texas, Baldridge showed Bentz a copy of the PO

that had been submitted authorizing his bridge work. Bentz testified "the story that I was supposed to stick to was that I did do the concrete work, and as long as we kept our stories together, you know, this witch hunt would go away." (*Id.* at 498.)

After Baldridge returned to Oklahoma, he gave Slover documents to fax to Bentz, even though Baldridge himself had access to a fax machine. According to Bentz's wife, the documents appeared to be a sort of deposition or "Q-and-A" with Baldridge apparently supplying answers to questions. (*Id.* at 473.) Bentz's wife "freaked out" after receiving the documents and Bentz destroyed the documents shortly thereafter.

When first interviewed by the FBI, Joe Bentz maintained that he performed work on behalf of the County. After he learned of the seriousness of the matter, he admitted he had not performed any work for the County. Brian Rash told the FBI agent investigating the case that he had done all the contract work reflected on the invoices, including mowing and ditch cleaning. When the FBI agent told him he could be charged if the agent thought he was lying, Rash changed his story and said all the work he did was at Sue Baldridge's residence.

G. Federal Benefits Received

Two individuals testified that for the fiscal year ending June 30, 2005, Rogers County received $493,000 and $99,768.19 on projects related to the Port of Catoosa from the Department of Housing and Urban Development; $65,945.78

for the Safe Rooms Rebate Program from the Department of Homeland Security, and $26,751.00 for emergency management from the Federal Emergency Management Agency, a total of $685,464.97.[3] No evidence was presented to indicate that Rogers County received any federal benefits outside the twelve-month period between July 1, 2004 and June 30, 2005.

## H.  Procedural History

On the basis of the conduct described above, Baldridge was charged with: conspiracy to violate 18 U.S.C. § 666(a)(1)(A), in violation of 18 U.S.C. § 371 (Count One); obtaining money and property by fraud and intentional misapplication by agent or local government that receives benefits under federal programs and aiding and abetting the same, in violation of 18 U.S.C. §§ 666 and 2 (Count Two); mail fraud in violation of 18 U.S.C. §§ 1341, 1346 (Counts Three and Four); money laundering and aiding and abetting the same in violation of 18 U.S.C. §§ 1956(a)(1)(B)(I) and 2 (Counts Five, Six and Seven); and corruptly persuading another and aiding and abetting the same in violation of 18 U.S.C. § 1512(b)(3) and 2 (Counts Eight and Nine).

Following a six-day trial, the jury found Baldridge guilty on all counts except Count Six.  Baldridge was sentenced to thirty-seven months imprisonment on each count to run concurrently.  Baldridge filed a timely notice of appeal.

---

[3]  The record incorrectly states the total is $684,464.97.

-12-

## II. DISCUSSION

Baldridge raises six allegations of error on appeal. He claims the prosecutor committed misconduct by insinuating Baldridge was a homosexual and the evidence was insufficient to support his conviction for: (a) conspiracy, because the government failed to establish interdependence among the alleged co-conspirators; (b) violation of 18 U.S.C. § 666, because the government failed to establish Rogers County received $10,000 or more in federal benefits in the same year the County was defrauded of over $5,000; (c) mail fraud, because use of the mails was not integral to a scheme to defraud; (d) money laundering, because the government did not prove Baldridge attempted to conceal the assets involved in the transactions; and (e) violation of 18 U.S.C. § 1512(b)(3), because the government did not prove Baldridge "corruptly persuaded" his alleged co-conspirators to hinder, delay or prevent communication with a law enforcement officer.

As discussed in more detail below, we review the claimed prosecutorial misconduct for plain error. We review the remaining allegations de novo, asking "only whether, taking the evidence—both direct and circumstantial, together with reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *United States v. Beers*, 189 F.3d 1297, 1301 (10th Cir. 1999) (quotations omitted). "[W]e will not reverse a conviction unless no rational trier

of fact could have reached the disputed verdict. The evidence necessary to support a verdict need not conclusively exclude every other reasonable hypothesis and need not negate all possibilities except guilt." *United States v. Serrata*, 425 F.3d 886, 895 (10th Cir. 2005) (quotations, citations and ellipses omitted).

A. Prosecutorial Misconduct

Baldridge claims the prosecutor committed misconduct during the direct examination of Joseph Bentz and cross-examination of Brian Slover by asking several questions "designed to insinuate that [Baldridge] and [S]lover had a homosexual relationship." (Appellant's Opening Br. at 17.) Baldridge takes issue with the following exchange between the prosecutor and Bentz:

Q: "Now, had the defendant and Mr. Slover previously been to your home in Texas?"

A. "Yes, just for random visits."

Q. "How many would you estimate?"

A. "I think twice they'd been there before."

Q. "Were they always together when they came?"

A. "Yes, sir."

(R. Vol. VII at 491-92.) Defense counsel did not object to any of these questions.

Baldridge also takes issue with an exchange between the prosecutor and Slover. After questioning Slover about the length of time he had lived together with the defendant, the prosecutor asked: "And would you say that you have a

-14-

very, very close relationship?" (R. Vol. VI at 644.) Slover responded: "Randy Baldridge is like a brother to me." (*Id.*) The prosecutor continued: "Do you love the defendant Randy Baldridge?" (*Id.*) Defense counsel objected on relevance grounds. The court sustained the objection and the witness did not answer the question.

Baldridge contends our standard of review is the two-step process for evaluating claims of prosecutorial misconduct set forth in *United States v. Gabaldon*, 91 F.3d 91, 94 (10th Cir. 1996) (asking whether the conduct was improper and, if so, whether it warrants reversal). That is the test we apply to evaluate the merits of a claim for prosecutorial misconduct, not our standard of review. *See United States v. Apperson*, 441 F.3d 1162, 1207 (10th Cir. 2006) (applying two-part test to evaluate the merits after determining standard of review was abuse of discretion); *United States v. Oberle*, 136 F.3d 1414, 1421 (10th Cir. 1998) (applying two-part test to evaluate the merits after determining standard of review was de novo as to one comment and plain error as to remaining comments).

Defense counsel did not object to the questions posed to Bentz quoted above. Thus, we review those questions for plain error. *See United States v. Sands*, 968 F.2d 1058, 1063 (10th Cir. 1992). As noted above, defense counsel did object to one of the questions posed to Slover, but only on relevance grounds. That objection was sustained and counsel did not request a curative instruction or

-15-

move for a mistrial. In *United States v. Taylor*, we reviewed a defendant's claim of prosecutorial misconduct for plain error where defense counsel objected to the prosecutor's remark during opening statement as being "inappropriate" and the court responded with a curative instruction to which counsel did not object. 514 F.3d 1092, 1095 (10th Cir. 2008). We explained:

> [T]he gravamen of Mr. Taylor's appeal is that, even after the district court's instructions to the jury, there remained a modicum of uncured prejudice sufficient to imperil his right to a fair trial. Mr. Taylor did not, however, alert the district court to his belief on this score. He neither advanced a contemporaneous objection to the district court's curative instruction, nor moved for a mistrial. Such actions, which would have given the district court the information necessary to evaluate the need for further curative steps, would have properly preserved the claim of error for appeal. Instead, for all that the district court knew, it had addressed Mr. Taylor's complaint to his satisfaction; it had no reason to believe any further issue or concern remained. Where this happens—where a party seeks on appeal to raise an issue not squarely presented to the district court in order to allow it to exercise its judgment in the first instance—we traditionally review only for plain error.

*Id.* at 1096.

Here, as in *Taylor*, defense counsel did nothing to highlight to the court his concern about the effect of the prosecutor's question after his objection was sustained. Moreover, and unlike in *Taylor*, the district court did not have notice that defense counsel believed the prosecutor's questioning of Slover to be an inappropriate attempt at "character assassination" or to rise to the level of prosecutorial misconduct. (Appellant's Reply Br. at 3.) Thus, we review the prosecutor's cross-examination of Slover for plain error.

-16-

Plain error occurs when there is (1) error, (2) that is plain, which (3) affects the defendant's substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *United States v. Ruiz-Terrazas*, 477 F.3d 1196, 1199 (10th Cir.), *cert. denied*, 128 S.Ct. 113 (2007). "When evaluating allegedly inappropriate remarks of counsel for plain error, we must view the remarks in the context of the entire trial." *Oberle*, 136 F.3d at 1421 (quotations and citations omitted).

Baldridge characterizes the prosecutor's questioning of Slover as "treacherously-calculated." (Appellant's Opening Br. at 24.) The government contends the examination of Bentz and the cross-examination of Slover were proper and sought only to establish Slover's "obvious potential bias in favor of [Baldridge]." (Appellee's Br. at 24.) We agree with the government.

It is permissible impeachment to expose a witnesses' bias. *United States v. Abel*, 469 U.S. 45, 51 (1984); *United States v. DeSoto*, 950 F.2d 626, 630 (10th Cir. 1991). At common law, bias describes the relationship between a witness and a party which might cause the witness to slant his testimony for or against the party. *Abel*, 469 U.S. at 52. Certainly, if Baldridge and Slover had been having an intimate relationship, Slover's testimony might well have been slanted in favor of Baldridge. And Slover could have been biased in favor of Baldridge even if their relationship was not sexual, but merely close. Baldridge claims this situation is exceptional because an insinuation of homosexuality in rural

-17-

Oklahoma is incendiary, not likely to be forgotten or forgiven by the jurors. Even if true, it is not a reason to craft a "homosexual exception" to a hallowed rule of evidence allowing wide latitude for the jury to assess possible witness bias. At most it would be a factor for the trial judge to consider upon a proper Rule 403 objection, absent here. Viewed in the context of the entire trial, we perceive no error in the prosecutor's questioning of Bentz and Slover.

## B. Conspiracy

The jury found Baldridge guilty of conspiracy to violate 18 U.S.C. § 666(a)(1)(A) in violation of 18 U.S.C. § 371. "To prove conspiracy, the government must show (1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent." *United States v. Yehling*, 456 F.3d 1236, 1240 (10th Cir. 2006). As to the last element, interdependence, this Court has explained: "[A] single conspiracy does not exist solely because many individuals deal with a common central player. What is required is a *shared*, single criminal objective, not just similar or parallel objectives between similarly situated people." *United States v. Small*, 423 F.3d 1164, 1182 (10th Cir. 2005) (quotations and citation omitted) (emphasis in original); *see also United States v. McCullough*, 457 F.3d 1150, 1161 (10th Cir. 2006) ("Interdependence exists where each coconspirators' activities constituted essential and integral steps

-18-

toward the realization of a common, illicit goal.") (quotations omitted).

Baldridge argues the evidence was insufficient to establish interdependence because "[t]he single conspiracy charged . . . was, at best, three, and possibly four, separate conspiracies in which similarly situated people pursued parallel objectives but *shared no single criminal objective tied together by mutual dependence and assistance*." (Appellant's Opening Br. at 32.) The government contends the co-conspirators had the common goal of creating and submitting to the County numerous false documents involving several different projects and vendors. The government also argues the evidence establishes "[a]t the very minimum, [Baldridge] conspired with Cindy Rash and Brian Rash with respect to the claim that resulted in the County paying for work done at the residence of [Baldridge's] sister." (Appellee's Br. at 34-35.)

Baldridge is correct that the evidence does not establish one single conspiracy; however, the government is correct that the evidence does establish a conspiracy between Baldridge, Brian Rash, and Cindy Rash sufficient to support Baldridge's conviction.

In *Kotteakos v. United States*, the Supreme Court decided many separate conspiracies do not become one merely because they all included a common defendant. 328 U.S. 750, 769 (1946). The Court explained that separate spokes meeting at a common center (a common defendant) constituting a wheel are a single conspiracy only if those spokes are enclosed by a rim (a common illicit

goal). *Id.* at 775. Here, the several spokes (Bentz, Long, and Brian Rash) lack the necessary rim. Though connected via their relationship with Baldridge, these individuals did not have a common, illicit goal, but rather, had similar or parallel objectives—specifically, to receive compensation from the County for work they did not perform,[4] did not fully perform[5] or were not otherwise authorized to receive.[6]

In *United States v. Carnagie*, we held the government failed to prove two widespread conspiracies involving the submission of fraudulent loan applications to the Federal Housing Administration because the evidence did not support a finding of interdependence. 533 F.3d 1231, 1240 (10th Cir. 2008), *cert. denied*, — S.Ct. —, 2009 WL425434 (2009). We distinguished drug conspiracies from financial conspiracies and explained there is a higher standard for proving interdependence in the latter:

> [T]here is a difference in the proof necessary to establish interdependence in a drug conspiracy from that necessary to link parallel financial transactions . . . . [B]ecause the manufacture, sale, and use of drugs is illegal, essentially every aspect of the drug

---

[4] Bentz received payment in the amount of $1,700 for work he did not perform.

[5] Long was paid for 38 hours of work on the Dog Creek Project (in the amount of $2,090) though he worked only 24 hours.

[6] Long was not authorized to receive payment from the County for work he performed on the Dog Creek Project or on the Robert Portiss driveway because he was a salaried employee. Brian Rash received payment from the County totaling $6,400 for work he did primarily at Sue Baldridge's residence.

distribution business is illegal. Each participant is presumptively aware of the illegal nature of the activity and of the existence of the illegal venture . . . . In contrast, selling real estate and obtaining loans for those sales is generally lawful. Unlawful activity, however, may occur as part of those otherwise lawful transactions . . . . In this situation, because the underlying transaction is generally lawful, one cannot infer an illegal common purpose in the same way that a common purpose could be found in a drug conspiracy. Instead, interdependence must be proved more precisely. The government must do more than prove that a defendant participated in a real estate transaction involving false documentation to demonstrate interdependence; it must show that each defendant's actions benefitted the common venture.

*Id.* at 1239 n.5. We explained: "[T]he [first defendant's] transactions in no way benefitted from or depended upon the success of the [second defendant's] transactions, and vice versa. The different groups engaged in similar transactions for similar reasons, but there was no showing of mutual dependence between them." *Id.* at 1240 (citations omitted). Similarly here, Long's actions did not benefit or depend upon the success of the actions of Brian Rash and Bentz and vice versa.

But that is not the end of the story. Cindy Rash prepared false documents with respect to the false claims made by Long, Brian Rash and Bentz. It is reasonable to infer she knew the documents she prepared for those individuals to receive payment were false. At a very minimum, the evidence clearly establishes she knew the payments to her husband were for work he did at Sue Baldridge's residence, for which he was not entitled to receive payment from the County. The payments to Brian Rash total $6,400 ($1,600 on Dec. 20, 2004, Feb. 7, 2005, May

-21-

2, 2005 and Aug. 16, 2005).  This exceeds the jurisdictional minimum of $5,000

and is sufficient to support a conviction for conspiracy.[7]

C.  18 U.S.C. § 666

Count Two of the indictment charged Baldridge with violating 18 U.S.C.

§ 666(a)(1)(A), which criminalizes and authorizes federal prosecution of a local

government official who "without authority knowingly converts . . . or

intentionally misapplies, property . . . valued at $5,000 or more" if the local

government "in any one year period" receives benefits from the federal

government "in excess of $10,000."  18 U.S.C. §§ 666(a)(1)(A)(I), (b).  The

government alleged that between November 30, 2004 and August 9, 2005,

Baldridge obtained by fraud and intentionally misapplied property valued at more

than $5,000 and, in that same period of time, Rogers County received benefits in

excess of $10,000 from the federal government.  The fraud which the government

---

[7] Though Baldridge does not argue the point, we note there is a variance between the indictment and the evidence adduced at trial because the evidence established a conspiracy different from that alleged in the indictment. *See United States v. Sells*, 477 F.3d 1226, 1237 (10th Cir. 2007) ("A simple variance arises when the evidence adduced at trial establishes facts different from those alleged in the indictment, and triggers harmless error analysis.  The defendant bears the burden of proof both to show that a variance occurred and that it was fatal.") (citation omitted).  The variance does not require reversal, however, because the narrower scheme is fully included in the indictment. *See United States v. Harrison*, 942 F.2d 751, 758 (10th Cir. 1991) ("A variance does not require reversal . . . unless the defendant can show that it affected her or his substantial rights.  A defendant's substantial rights are not prejudiced merely because the defendant is convicted upon evidence which tends to show a narrower scheme than that contained in the indictment, provided that the narrower scheme is fully included within the indictment.") (quotations and citations omitted).

alleged formed the basis of this count was: (1) the issuance of four warrants to Brian Rash each in the amount of $1,600 on December 20, 2004; February 7, 2005; May 2, 2005 and August 16, 2005; and (2) the issuance of a warrant to Joseph Bentz in the amount of $1,700 on August 9, 2005. Baldridge contends there was insufficient evidence to support his conviction on this count because the government failed to prove he misapplied property valued at more than $5,000 in the same year the evidence established Rogers County received more than $10,000 in federal benefits.

The evidence introduced at trial showed Rogers County received $685,464.97 in federal benefits during the period from July 1, 2004 to June 30, 2005, while the total amount of fraud alleged during this same period totaled only $4,800 (payments to Rash of $1,600 each on December 20, 2004, February 7, 2005, and May 2, 2005).[8] Baldridge claims this Court found the one-year period encompassed in § 666(a) was the same one-year period referenced in § 666(b) in *United States v. LaHue*, 170 F.3d 1026 (10th Cir. 1999). (Appellant's Opening Br. at 36.) The government contends "the statute does not limit the twelve month period to a fiscal or calendar year" and does not require all the illegal conduct occur during the twelve month period in which the benefits were received.

---

[8] The warrant to Jones for Long's work on the Dog Creek Project was issued on August 10, 2004 and falls within this one year period. However, that warrant was not included as a basis for this count and thus we do not consider it here.

(Appellee's Br. at 37.)  The government is correct.

The phrase "any one-year period" used in § 666(b) is defined as "a continuous period that commences no earlier than twelve months before the commission of the offense or that ends no later than twelve months after the commission of the offense.  Such period may include time both before and after the commission of the offense."  18 U.S.C. § 666(d)(5).  As the Fifth Circuit described it, "[t]his is an exact numeric minimum per year that must be supported by record evidence."  *United States v. Jackson*, 313 F.3d 231, 235 (5th Cir. 2002).[9]  The evidence established the County received $72,560 in federal benefits on September 27, 2004.  This amount alone provides a jurisdictional basis for Baldridge to be held liable under § 666(a) for any fraud committed from September 27, 2004 to September 26, 2005.  This time period includes the dates on which all of the warrants which form the basis of Count Two were issued (Dec. 20, 2004; Feb. 7, 2005; May 2, 2005; Aug. 9, 2005; and Aug. 16, 2005).

Baldridge also contends all of the monies paid to Rash and Bentz may be deemed legitimate under the safe harbor provision of 18 U.S.C. § 666(c) which excludes liability for payment of "bona fide salary, wages, fees, or other compensation paid . . . in the usual course of business."  He relies on *United*

---

[9] In *Jackson*, the court reversed a guilty verdict where "the record reveal[ed] a dearth of evidence to support the essential element that the City received more than $10,000 per year in federal funds."  313 F.3d at 238.

-24-

*States v. Harloff*, 815 F. Supp. 618 (W.D.N.Y. 1993), but that case is inapposite. In *Harloff*, the court dismissed several counts of an indictment concluding the conduct alleged fell within the safe harbor provision of § 666(c) as a matter of law. The government alleged the defendants violated § 666 by "falsifying payroll records by claiming to have worked 40-hour weeks when in fact they worked substantially fewer hours." *Id.* at 618 (quotations omitted). The court found, however, that "[a] plain reading of [§ 666(c)] . . . prohibits a prosecution under § 666 based on an employee's accepting wages for more hours than she actually worked," because Congress did not "intend[] to criminalize an employee's early departure from work." *Id.* at 619. "Thus, *Harloff* stands merely for the proposition that § 666(c) is applicable to allegations that an employee worked fewer hours than that for which she was obligated." *United States v. Bryant*, 556 F. Supp. 2d 378, 427 (D.N.J. 2008).

Brian Rash and Joseph Bentz are not alleged to have merely worked fewer hours than they were obligated. It is undisputed Rash was paid for work he did at Sue Baldridge's residence. Because this was not work for which he could have been paid by the County, the payment was not a bona fide wage paid in the usual course of business. *See United States v. Cornier-Ortiz*, 361 F.3d 29, 36 (1st Cir. 2004) (holding jury could have concluded payments were not "bona fide" where the law "prohibited such a scheme" and the defendant "intentionally misapplied" payments to skirt the applicable regulations). And Bentz was paid for doing no

work, not fewer hours of work, so his payment likewise could not have been bona fide.

D.  Mail Fraud

Count Three of the indictment charged Baldridge with mail fraud relating to the warrant sent to Brad Jones as payment for Bruce Long's work on the Dog Creek Project.  Count Four charged Baldridge with mail fraud relating to the warrant that went to Bellco as payment for the Ray Davis Road project, which included payment for the Portiss driveway.  The jury convicted Baldridge on both counts.  He contends the evidence was insufficient to support his conviction on these counts because use of the mails was not integral to any scheme to defraud.

The mail fraud statute provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises . . . for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service . . . or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail . . . according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1341.  "To establish guilt under [this statute], the government had to prove that (1) [Baldridge] engaged in a scheme or artifice to defraud or to obtain money by means of false and fraudulent pretenses; (2) he did so with the intent to

-26-

defraud; and (3) he used the United States mails to facilitate that scheme."
*United States v. Chavis*, 461 F.3d 1201, 1207 (10th Cir. 2006) (quotations, citation and ellipses omitted).

Baldridge contends his use of the mails was not an integral part of the scheme to defraud, but that is not a necessary element. The Supreme Court has explained: "To be part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." *Schmuck v. United States*, 489 U.S. 705, 710-11 (1989) (quotations and citations omitted).

Baldridge incorrectly relies on *United States v. Lynn*, 461 F.2d 759 (10th Cir. 1972). In *Lynn*, the defendant used a stolen credit card at two retail establishments. The first business sent the credit card sales draft from the purchase to its accounting office via registered mail. The second business deposited the credit card sales draft in a local bank and it was ultimately sent to a different bank via the United States mail. We held this evidence was insufficient to support a mail fraud conviction because "[u]tilization of the mails after the scheme has been fully consummated and completed in all of its parts cannot supply the essential ingredients for this offense." *Id.* at 762. We noted the defendant did not consciously avail himself of the use of the mails and what the retail establishments chose to do after the defendant used the credit card was "immaterial." *Id.* at 763.

Here, by contrast, Baldridge intentionally availed himself of the use of the mails.  While this was not an essential element of the scheme, it facilitated an illegal payment, which was part of his scheme to defraud.  That alone is sufficient to support liability.  *See, e.g., United States v. Primrose*, 718 F.2d 1484, 1490 (10th Cir. 1983) (affirming conviction for mail fraud where "the mailing of invoices and warrants ensured that the vendors got paid, which was an essential part of the scheme").

E.  Money Laundering

In Count Five, the government alleged Baldridge violated the Money Laundering Control Act, 18 U.S.C. § 1956 (the Act), when the County issued a warrant to Brad Jones in the amount of $2,090, which represented payment for Bruce Long's work on the Dog Creek Project.  It is undisputed that the majority of the funds were ultimately received by Long and Baldridge did not intend to and did not receive any of the funds.  In Count Seven, the government alleged Baldridge violated the Act when the County issued a warrant to Joseph Bentz in the amount of $1,700 for work he did not do.  Bentz cashed the warrant and issued two checks from it—one to pay his property taxes and the other to pay Baldridge for a legitimate debt (to compensate him for his services on Bentz's triplex).  Baldridge deposited $600 of the $700 payment into his personal checking account and kept $100 in cash.

The Act provides in pertinent part:

Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . knowing that the transaction is designed in whole or in part [ ] to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(I). In order to obtain a conviction under the Act, the government must prove four elements beyond a reasonable doubt: "(1) that Defendant engaged in a financial transaction; (2) that Defendant knew that the property involved in that transaction represented the proceeds of his unlawful activities; (3) that the property involved was in fact the proceeds of that criminal enterprise; and (4) that Defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities." *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1473 (10th Cir. 1994) (quotations omitted).

Baldridge challenges only the fourth element, which we have referred to as the "design requirement." *See id.* As to the Long/Jones payment, the government contends it satisfies the design requirement because the issuance of the warrant to Jones was designed to conceal the fact the payment was intended for Long. As to the Bentz payment, the government contends it was designed to obscure the fact

Baldridge received $700 in County funds.

In *United States v. Shepard*, we explained:

This court has discussed several types of evidence that may demonstrate an intent to disguise or conceal illegal proceeds: They include, among others, statements by a defendant probative of intent to conceal; unusual secrecy surrounding the transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating [sic] in the transaction; or expert testimony on practices of criminals.

396 F.3d 1116, 1120 (10th Cir. 2005) (quotations and citation omitted).

Baldridge clearly structured the Long/Jones payment in a way to avoid attention, specifically requesting that Long find a nominee to whom payment could be made, and the use of Jones as a third party concealed the real owner of the funds. This is sufficient to satisfy the design requirement.

As to the Bentz payment, it represents an attempt by Baldridge to use a third party (Bentz) to conceal the real owner of the money (first, the County, then ultimately, Baldridge). In *Shepard*, we explained "[u]sing third parties to conceal the real owner supports the inference of intent to disguise or conceal illegal funds. Under 18 U.S.C. § 1956(a)(1)(B)(I), we may infer a design to conceal or disguise unlawful proceeds when a defendant transfers those proceeds into the control of others with whom the defendant has a very close relationship." *Id.* at 1122 (quotations and citations omitted). Thus, we held "[a] rational jury could reasonably conclude that Mr. Shepard intended to conceal or disguise the

-30-

unlawfully gained checks when he deposited them in his daughter's account." *Id.* This same reasoning supports the jury's verdict on Count Seven. Baldridge can be held liable for accepting payment from Bentz that he knew to be unlawful, even though the debt itself was legitimate. The transaction gave the false impression Bentz was the source of the funds and created documentary evidence that could mislead an investigator. *See Garcia-Emanuel*, 14 F.3d at 1476-77 (reinstating conviction on one count of money laundering where defendant presented a cashier's check on which his restaurant was listed as remitter to pay for land because "[t]he transaction not only creates the false impression that the restaurant was his source of wealth, but it creates documentary evidence in support of that deception that could mislead an investigator").

F. 18 U.S.C. § 1512(b)(3)

Counts Eight and Nine of the indictment alleged Baldridge knowingly corruptly persuaded Brian Rash and Joseph Bentz to hinder, delay or prevent their communication with the FBI in its investigation of Baldridge in violation of the witness tampering statute, 18 U.S.C. § 1512(b). Baldridge contends the evidence was insufficient to support his conviction on these counts because at no point during his conversations with Rash or Bentz did he ever threaten or intimidate them or tell them to tell a story that they stated was not true. As discussed below, the fact Baldridge did not threaten or intimidate Rash or Bentz is not determinative. Rather, to be found liable under § 1512(b), the evidence must

have been sufficient for a reasonable jury to conclude Baldridge persuaded Rash and Bentz to lie to investigators. It was.

18 U.S.C. § 1512(b)(1) provides: "Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so . . . with intent to [ ] influence, delay or prevent the testimony of any person in an official proceeding . . . shall be fined under this title or imprisoned not more than 20 years, or both." All courts that have considered the issue have found the phrase "corruptly persuades" to be ambiguous. *See, e.g., United States v. Khatami*, 280 F.3d 907, 912 (9th Cir. 2002); *United States v. Farrell*, 126 F.3d 484, 487 (3d Cir. 1997). The statute does not define the phrase but (rather unhelpfully) explains it "does not include conduct which would be misleading conduct but for a lack of a state of mind."[10] 18 U.S.C. § 1515(a)(6). The phrase cannot simply mean persuade with intent to influence the statements of another person because such an interpretation would render the word "corruptly" meaningless. *See Farrell*, 126 F.3d at 487.

Looking to the plain meaning:

The word "corruptly" has several different meanings. Its root, the adjective "corrupt," is defined as morally degenerate and perverted and characterized by improper conduct (as bribery or the selling of favors). The verb "corrupt" has both transitive, as to change someone from good to bad in morals, manners, or actions; bribe, and

---

[10] The words "corruptly persuade" did not appear in the original version of § 1512, but were added by amendment in 1988. *See Khatami*, 280 F.3d at 912.

-32-

intransitive, as to become oneself morally debased, meanings.  Given these definitions, "corruptly" in § 1512(b) may modify "persuades" to require persuasion through some corrupt means, persuasion of someone to engage in some corrupt conduct, and/or persuasion characterized by some "morally debased" purpose.

*Id.* at 488 n.2 (quotations, citations, ellipses and alterations omitted).  The *Farrell* court found little assistance in the statute's legislative history but ultimately concluded that a non-coercive attempt to persuade a witness to lie to investigators constitutes a violation of § 1512(b).  *See id.* at 488.  All circuits that have considered the issue have concluded likewise.  *See Khatami*, 280 F.3d at 912-13 (citing cases from the First, Second, Third, Eighth, Eleventh, and D.C. Circuits); *see also United States v. Davis*, 380 F.3d 183, 196 (4th Cir. 2004) ("As we read the statute, the 'corruptly persuades' language . . . encompasses non-coercive attempts by a target of a criminal investigation to tamper with prospective witnesses.") (quotations, alterations and emphasis omitted).  Thus, the question presented here is not whether Baldridge's conduct was coercive—it clearly was not—but whether his conduct constituted an attempt to persuade Rash and/or Bentz to lie to investigators.

Baldridge asserts the evidence was insufficient to establish he attempted to persuade Rash or Bentz to lie to investigators because neither ever told Baldridge what he asked them to say was wrong.  The government argues "[n]either Bentz nor Brian Rash had to tell defendant the claims were false, because defendant already knew they were false, indeed, he was the major impetus for their falsity."

(Appellee's Br. at 48.)  We agree with the government.

In *United States v. Burns*, the Sixth Circuit held the defendant "attempted to 'corruptly persuade' [the witness] by urging him to lie about the basis of their relationship, to deny that [the witness] knew Burns as a drug dealer, and to disclaim that Burns was [the witness's] source of crack cocaine."  298 F.3d 523, 540 (6th Cir. 2002).  The facts here are not nearly as dramatic, but still support liability.  We have, on one previous occasion, considered the "corruptly persuaded" language.  In *United States v. Stroup*, we concluded a jury could have found beyond a reasonable doubt that the defendant attempted to corruptly persuade a witness, "reject[ing] Defendant's contention that the statutory language requires evidence of threats or a direct request to lie."  291 Fed. Appx. 868, 870 (10th Cir. 2008) (unpublished).[11]  We held the "corruptly persuades" element "requires the government to prove a defendant's action was done voluntarily and intentionally to bring about false or misleading testimony or to prevent testimony with the hope or expectation of some benefit to the defendant or another person."  *Id.* (quotations and ellipses omitted).  That standard is clearly satisfied here.

**AFFIRMED.**

---

[11] We cite this unpublished case not as precedent but for its persuasive value.  *See* 10th Cir. R. 32.1(A).

-34-