FILED
United States Court of Appeals
Tenth Circuit

April 15, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

PHILIP R. LOCHMILLER,
a/k/a Philip R. Lochmiller, Sr.,

Defendant-Appellant.

No. 12-1097
(D.C. No. 1:09-CR-00529-PAB-1)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Chief Judge, **HOLLOWAY**, Senior Circuit Judge, and **TYMKOVICH**, Circuit Judge.

A jury convicted Philip Lochmiller, Sr. of various crimes arising from an investment scheme, including conspiracy to commit mail and securities fraud, conspiracy to commit money laundering, and multiple substantive counts of mail fraud and money laundering. The district court sentenced Mr. Lochmiller to 405 months in prison and ordered him to pay more than $18.6 million in restitution. In

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to grant the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

this direct appeal, Mr. Lochmiller challenges his conspiracy convictions, claiming they were predicated on insufficient evidence and a flawed jury instruction. We have jurisdiction under 28 U.S.C. § 1291 and affirm Mr. Lochmiller's convictions.

I

In 1999, Mr. Lochmiller began soliciting investors to develop low-income residential communities. At the time, Mr. Lochmiller was president and founder of Valley Mortgage, Inc., or Valley Investments, Inc., as it came to be known, a mortgage brokerage firm based in Grand Junction, Colorado. Mr. Lochmiller's step-son, Philip Lochmiller, Jr. ("Philip"), joined the firm that same year, and together the two men turned the company into something of a Ponzi scheme. Mr. Lochmiller and his son would advertise in a local paper and mail out promotional materials promising investors a 10%, 14%, or even a 20% return on two-year investments. They told investors that obtaining bank financing was more onerous than their offer, which pledged as security a promissory note and first deed of trust recorded against specific property planned for development. The property's value was supposed to be commensurate with the investment amount, and investors had the option of choosing simple or compound interest, which was actually paid to some investors. What investors did not know, however, was that the interest was actually paid from new investments rather than company profits, and the trust deeds were almost always recorded against previously encumbered and inadequately valued lots, if they were recorded at all.

- 2 -

As early as 2001, the state of Colorado ordered Mr. Lochmiller to stop soliciting investments because neither he nor his company was licensed to sell securities. Mr. Lochmiller ignored the order, however, and in the coming years, he diverted significant investment funding from project development to personal use. Indeed, he used the money to pay for homes and cars for himself and his family, a vacation property in Mexico, and his daughter's salary despite the fact that she never worked for Valley Investments. Mr. Lochmiller even deposited company funds into his own "private venture" account, R., Vol. 5 at 1252, all without any knowledge to his investors.

In 2005, Philip hired an assistant named Shawnee Carver, who took charge of tracking the number of trust deeds recorded against or "stacked" on a particular lot. Ms. Carver also helped prepare false promotional materials, notarize forged investor signatures, and mislead investors into releasing their deeds of trust. She kept much of the individual investor documents away from the company's chief financial officer, Richard Langley, but Mr. Langley, who was hired in May 2008 and resigned four months later, eventually accessed some materials. What he found was staggering but perhaps not surprising: the company was losing as much as $60,000 on any given home sale, and the interest rates promised to investors were "unsustainable," *id.* at 1244. Mr. Langley urged Mr. Lochmiller to reduce the interest rates and revise his development plans, but Mr. Lochmiller rejected Mr. Langley's suggestions and intensified his efforts to solicit more investments.

By 2009, Mr. Lochmiller had amassed an estimated $34 million in liabilities. The company went into receivership, and Mr. Lochmiller, Philip, and Ms. Carver were charged in a multi-count superceding indictment. Ms. Carver pleaded guilty to conspiracy to commit mail and securities fraud and testified at Mr. Lochmiller's trial, as did Philip, who pleaded guilty to conspiring to commit mail and securities fraud and conspiring to commit money laundering. For his part, Mr. Lochmiller was convicted on one count of conspiracy to commit mail and securities fraud, 18 U.S.C. § 371; one count of conspiracy to commit money laundering, 18 U.S.C. § 1956(h); ten counts of mail fraud and aiding and abetting, 18 U.S.C. §§ 1341, 2; and twenty counts of money laundering and aiding and abetting, 18 U.S.C. §§ 1957, 2.

II

## A. *Sufficiency of the Evidence*

Mr. Lochmiller first challenges the sufficiency of the evidence supporting his conspiracy convictions. He first raised this issue at the close of the government's case-in-chief, when he moved for a judgment of acquittal under Fed. R. Crim. P. 29. The district court denied the motion, as well as Mr. Lochmiller's renewed motion for acquittal. On appeal, Mr. Lochmiller maintains there was insufficient evidence of a conspiracy and if there was any such evidence, it showed only a variance.[1]

---

[1] A variance occurs when "an indictment charges a single conspiracy, but the evidence presented at trial proves only the existence of multiple conspiracies." *United States v. Caldwell*, 589 F.3d 1323, 1328 (10th Cir. 2009) (internal quotation marks omitted).

Our review is limited by the considerable deference owed to the jury's verdict. *See United States v. King*, 632 F.3d 646, 650 (10th Cir. 2011). We review the sufficiency of the evidence de novo but ask "only whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt." *Id.* (internal quotation marks omitted).

### 1. *Conspiracy Convictions*

Mr. Lochmiller was convicted of conspiracy to commit mail and securities fraud and conspiracy to commit money laundering. To obtain these convictions, the government was obligated to prove "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent." *United States v. Fishman*, 645 F.3d 1175, 1186 (10th Cir. 2011); *see also United States v. Cooper*, 654 F.3d 1104, 1116 (10th Cir. 2011) (setting forth elements of mail fraud); *United States v. Lewis*, 594 F.3d 1270, 1274 (10th Cir. 2010) (setting forth elements of securities fraud); *United States v. Keck*, 643 F.3d 789, 794 (10th Cir. 2011) (setting forth elements of conspiracy to commit money laundering). "[C]onspiracy convictions may be based on circumstantial evidence, and the jury may infer conspiracy from the defendants' conduct and other circumstantial evidence indicating coordination and concert of

action." *United States v. Wardell*, 591 F.3d 1279, 1287 (10th Cir. 2009) (internal quotation marks omitted). "Interdependence is present if the activities of a defendant charged with conspiracy facilitated the endeavors of other alleged coconspirators or facilitated the venture as a whole." *Id.* at 1291 (internal quotation marks omitted).

The government clearly met its burden here. The conviction for conspiracy to commit mail and securities fraud was supported by evidence that Mr. Lochmiller, Philip, and Ms. Carver worked together to send false and misleading solicitations to investors via the mail. The parties stipulated that the promissory notes were securities, *see* Aplee. Addendum at 124-25, and there was evidence that the notes and trust deeds were represented to secure investments in entry-level home construction. Philip testified that he and Mr. Lochmiller told investors the funds were to be used for building entry-level homes throughout the Rocky Mountain region, R., Vol. 5 at 1026, though he acknowledged that four of their five communities in Colorado, Utah, and Idaho were never fully approved for development, *see id.* at 1047-52. Investors were told by Mr. Lochmiller and his son that the property securing their money was worth as much as their investment or more. Most investors simply trusted that they had priority on the encumbered property, but a few demanded a first deed of trust. In those instances, Ms. Carver would mail a packet to senior lien holders, asking them to release their deeds of trust because the property had been sold. On several occasions when a release was not returned before a scheduled closing, Philip testified that he would confer with Mr. Lochmiller and forge the investor's signature on the

- 6 -

release.  Ms. Carver would then facilitate the scheme by notarizing the forged release, though she claimed the document was signed outside of her presence, and the closing would go forward, along with the investment.

Once an investment matured, Mr. Lochmiller, Philip, and Ms. Carver would mail to investors false promotional materials, touting the success and growth of Valley Investments and encouraging investors to renew their accounts to obtain interest rates as high as 20%.  These letters were generally drafted by Mr. Lochmiller and typed by Ms. Carver, even after Mr. Langley alerted the Lochmillers to the company's dire financial state.  Mr. Lochmiller and Philip also went so far as to send letters and solicitations to investors explaining why Valley Investments continued to expand and outperform the competition, even during the financial recession.

Of course, none of these improprieties were known to investors.  Among numerous material omissions and misrepresentations, investors were never told that Mr. Lochmiller and Philip had prior bankruptcy discharges or that Mr. Lochmiller had been previously convicted of felony securities fraud.  Nor were investors told that most of the interest payments made to investors were derived from new investments rather than company profits.  Additionally, investors were never told that their supposed first deed of trust would be recorded behind as many as ten or twelve other investors, if it was recorded at all.  In fact, Ms. Carver testified that she mailed out deeds of trust listing particular lot numbers that did not even exist.  She also admitted that on occasions when investors demanded a recorded first deed of trust,

she persuaded other investors to release their trust deeds by lying to them that the property had been sold. And when investors asked why they had not received their deeds of trust, she intentionally stalled, telling them the delay was caused by the clerk and recorder's office. Finally, she misrepresented to investors in England the number of homes sold each month and falsely assured other investors that business was "thriving" because they had a "niche product of entry level homes," R., Vol. 5 at 523.

Ample evidence also supports Mr. Lochmiller's conviction for conspiracy to commit money laundering. Philip admitted that investor funds were regularly diverted to the Lochmillers' personal expenses, including a condo in Mexico purchased by Mr. Lochmiller with funds wired to him by Philip; more than $144,000 for Mr. Lochmiller's back taxes, hand-delivered to the IRS by Philip; and mortgage payments for a home occupied by Philip's older sister, who was allowed to retain the sale proceeds when the home sold, even though it was owned by Valley Investments. Additionally, Mr. Lochmiller directed—and Philip authorized—payments for Philip's mother and a salary to Philip's younger sister, neither of whom worked for the company; personal credit cards; cars and trucks; Mr. Lochmiller's $1.5 million custom-built home; and $150,000 to prevent a former employee from disclosing the company's insolvency, *see* R., Vol. 5 at 1535-40.

Apart from these expenses, Philip corroborated Mr. Langley's testimony that Mr. Lochmiller maintained a separate checking account as his own "private venture."

*Id.* at 1252. Mr. Lochmiller had opened this account in the name of New Liberty Homes and used it to deposit rebate checks issued to Valley Investments by one of its vendors. But rather than use those funds for developing low-income communities, Mr. Lochmiller exploited it for his own personal gain. All of this evidence amply supports Mr. Lochmiller's convictions for conspiracy to commit mail and securities fraud and conspiracy to commit money laundering. Mr. Lochmiller's assertion that there was no testimony of an express agreement is unavailing because there was no need for such testimony. *See Cooper*, 654 F.3d 1104, 1115 (10th Cir. 2011).

### 2. *Variance*

Despite the evidence underlying his convictions, Mr. Lochmiller suggests there was a variance from the overall conspiracies charged in the indictment. We disagree. Given the difficulty of distinguishing between a single conspiracy and multiple smaller conspiracies indicating a variance, we "generally defer to the jury's determination of the matter." *Fishman*, 645 F.3d at 1189. The "focal point of the analysis is whether the alleged coconspirators' conduct exhibited interdependence," that is, whether they "intend[ed] to act together for their shared mutual benefit within the scope of the conspiracy charged." *Id.* (alterations and internal quotation marks omitted).

The foregoing evidence demonstrates the extent of interdependence exhibited by Mr. Lochmiller, Philip, and Ms. Carver. These were not mere business associates working in the same environment, making similarly bad decisions; these were closely

aligned actors who coordinated their roles to facilitate their fraudulent scheme, conceal their deceptive conduct, and perpetuate their unlawful practices. *See United States v. Baldridge*, 559 F.3d 1126, 1136 (10th Cir. 2009) ("What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people."). Mr. Lochmiller and Philip worked together for years to defraud investors out of millions of dollars that they used for their own personal expenses. After Ms. Carver joined the firm, she furthered the goals of the conspiracy by lying to investors, misrepresenting the solvency of the company, notarizing forged documents, and restricting Mr. Langley's access to investor materials that would have, and indeed did, disclose the true state of affairs. There was no variance here.

## B. Jury Instruction

Mr. Lochmiller next contends the jury was given a prejudicial instruction that allowed him to be convicted for the actions of his co-conspirators. Because he failed to object in the district court, we review only for plain error. *See* Fed. R. Crim. P. 52(b). "Under plain error review, we may not reverse unless we find (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, we may then exercise discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Knight*, 659 F.3d 1285, 1287 (10th Cir. 2011), *cert. denied*, 132 S. Ct. 1954 (2012) (internal quotations and brackets omitted). We perceive no error.

The district court instructed the jury as follows:

If you find the defendant guilty of the conspiracy charged in Count 1 and you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy another coconspirator committed one or more of the offenses in Counts 24-33, and that the same offenses in Counts 24-33 were committed to achieve an objective of or were a foreseeable consequence of that conspiracy, then you may find the defendant guilty of the offenses charged in Counts 24-33, even though the defendant may not have participated in any of the acts which constitute the offenses described in Counts 24-33 . . . .

. . . .

Likewise, if you find the defendant guilty of the conspiracy charged in Count 2 and you find beyond a reasonable doubt that during the time the defendant was a member of that conspiracy another coconspirator committed one or more of the offenses in Counts 3-6, 8-21, and 23, and that the same offenses in Counts 3-6, 8-21, and 23 were committed to achieve an objective of or were a foreseeable consequence of that conspiracy, then you may find the defendant guilty of the offense charged in Counts 3-6, 8-21, and 23, even though the defendant may not have participated in any of the acts which constitute the offenses described in Counts 3-6, 8-21, and 23 . . . .

R., Vol. 2 at 81-82.

These instructions, which track nearly verbatim Tenth Circuit Criminal Pattern Jury Instruction 2.21, correctly state that Mr. Lochmiller may be held criminally liable for the reasonably foreseeable crimes committed by his co-conspirators in furtherance of the conspiracy. *See Pinkerton v. United States*, 328 U.S. 640, 647 (1946). Mr. Lochmiller seems to argue that only crimes committed as an object of the conspiracy, rather than those that were reasonably foreseeable, could be imputed to him, but that is not the law. "The *Pinkerton* doctrine holds each member of a conspiracy legally responsible for the reasonably foreseeable crimes of fellow

- 11 -

conspirators committed in furtherance of the conspiracy." *Wardell*, 591 F.3d at 1291. Our pattern jury instruction, which incorporates *Pinkerton*, specifically states that a crime "committed to achieve an objective of or was a foreseeable consequence of th[e] conspiracy" may be attributed to the defendant. 10th Cir. Crim. Pattern Jury Instruction 2.21. Hence, the jury was correctly instructed that Mr. Lochmiller could be held criminally liable for reasonably foreseeable crimes committed by his co-conspirators in furtherance of the conspiracy.

Mr. Lochmiller's convictions are affirmed.

Entered for the Court


Timothy M. Tymkovich
Circuit Judge