FILED
United States Court of Appeals
Tenth Circuit

May 27, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

STEVEN FISHMAN,

Defendant - Appellant.

No. 09-5155

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. 4:07-CR-00195-CVE-4)**

---

Submitted on the briefs:[*]

Steven Fishman, Pro Se, San Pedro, California, Defendant - Appellant.

Thomas Scott Woodward, United States Attorney, Northern District of Oklahoma, and Kevin C. Leitch, Assistant United States Attorney, Tulsa, Oklahoma, for Plaintiff - Appellee.

---

Before **TYMKOVICH**, **SEYMOUR**, and **ANDERSON**, Circuit Judges.

---

[*]After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist in the determination of this appeal. See Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

**ANDERSON**, Circuit Judge.

Defendant and appellant Steven Fishman was found guilty by a jury of conspiracy to commit mail and wire fraud and conspiracy to commit money laundering. He was sentenced to 262 months' imprisonment, three years of supervised release, and $3,684,213 in restitution. Challenging his conviction and sentence on numerous grounds, Mr. Fishman brings this appeal. We affirm his conviction and sentence.

## BACKGROUND

### I.     Caribou Program

Beginning in the late 1990s, Mr. Fishman, along with co-conspirators Robert Searles, Joseph Lynn Thornburgh, Wayne Davidson, and others, participated in a fraudulent investment scheme based on the sale of interests in worthless (except as collectibles) bonds issued in 1913 by the Chinese government ("Chinese bonds"),[1] and in the 1850s by the long-since bankrupt Galveston, Houston and Henderson Railroad ("GH&H" or "Galveston bonds"). These and similar antique bonds were referred to as "historic bonds." The sales

_____

[1]"Chinese Government 5% Reorganisation Gold Loan of 1913" bonds issued by the Chinese government led by Yuan Shikai, as described by a Searles depository certificate. R. Vol. 6 at 2001-02. Those obligations were later repudiated by the succeeding government of the People's Republic of China.

pitch for the obsolete Galveston bonds, which were the primary product, portrayed them as immensely valuable for use as secondary collateral to obtain huge lines of credit from unspecified European banks. The supposed credit lines would then support unspecified "high yield" trading programs which would allegedly produce a return on bond investment of around ten-fold per week for forty weeks. Thus, for example, it was represented, that an investment of $100,000 to participate in the profits from one 1855 $100 face value ten percent GH&H historic bond would yield profits of $1,100,000 per week for forty weeks, for a total return in a year or less of $44,000,000. R. Vol. 1 at 60. And, to make the investment opportunity more enticing, prospective investors were promised, in writing, a full refund of their money in sixty days if profits were not paid as specified.

To support such a rosy scenario for investors, the conspirators clothed the bonds in value by paying an individual to act as an "authenticator" not only as to the authenticity of a bond (actual original) but also as to its worth according to the authenticator's own terminology, theory and method. The authenticator then determined worth not in terms of sale, investment or redemption value but in terms of a "hypothecation valuation," i.e., potential use as a pledge against credit, by calculating compound interest for 144-plus years and the weight of gold to be used for payment, valued at the current market, and then using a formula to arrive at a result. The results were astronomical. Thus, for instance, as of January 1,

-3-

2000, the authenticator, John Clancy, placed a hypothecation valuation of $1,840,763,697 on each $100 GH&H ten percent bond.  R. Vol. 6 at 2337-39.  By 2003 Clancy was assigning a value of almost fifteen billion dollars to each $500 Galveston bond.  Id. at 2153-54.  The conspirators further bolstered their story by representing that the Florida Supreme Court had secretly issued an opinion, being kept under seal in chambers, which established the validity of the bonds.  They also assured prospects that the United States government had assumed the railroad's obligation for the bonds following the civil war, and that the obligation represented by the bonds was still a "live" debt backed by the Federal government.  R. Vol. 4 at 1218.

In general (the details of each sale varied from investor to investor), the mechanics of the operation called for investors to enter into a "Non-Circumvention/Non-Disclosure and Joint Venture Agreement" ("Agreement") with Caribou Capital Corporation ("Caribou"), a North Carolina corporation set up by Robert Searles and operated by him on behalf of the conspirators out of its home office in Madisonville, Tennessee.  Caribou was designated on the documents as the Program Coordinator, and described in the Agreement as having "valuable knowledge of private placement programs dealing in Historical Gold Backed Railroad Bonds."  R. Vol. 1 at 60.  Investor funds were largely deposited in the Caribou bank account at the SunTrust Bank in Loudon, Tennessee, and disbursements to the conspirators were mostly  made from that account, with

Searles acting as paymaster. The GH&H bonds, in the name of either Searles or Thornburgh, were placed in a "Safekeeping Depository" which issued Safekeeping Receipts or Certificates representing the bonds. The original certificates were then sent to Patrick Henriette, the group's designated "Program Manager" in Europe, ostensibly for presentation to European banks. A certified copy of each certificate was sent to the purchasing investor. Id.

After obtaining money from an investor, the conspirators employed stalling tactics to explain away the lack of any promised return. For literally years, one or another of the conspirators advanced excuse after excuse and glowing progress reports designed to string the increasingly distressed investors along and lull them into not taking any action. Some investors were also offered a new opportunity to invest in the Chinese bonds for a "can't miss" quick deal where the alleged imminent redemption of those bonds by the current government of China would make the investor whole. When those tactics finally wore out, investors were offered yet another document (Termination and Hold Harmless Agreement) to sign, promising a full refund of their initial investment on an agreement not to sue. Predictably, no refund occurred. The end game had the conspirators blaming each other, nefarious government agents, and government seizures of bonds and files, for thwarting the investment program.

Throughout, the co-conspirators generally cooperated with one another, interdependently, to further the goals of the conspiracy to sell interests in the

worthless bonds.  Mr. Searles, as president and organizer of Caribou, operated at the business and banking center of the enterprise both as a salesman and a manager.  Mr. Thornburgh was in sales.  Mr. Davidson was in sales in New Zealand and Australia.  Mr. Henriette provided the European window dressing, and Mr. Fishman provided the "neural glue," as described by the government.  In aid of the efforts by Messrs. Thornburgh, Davidson and Searles, Mr. Fishman drafted and furnished documents, consulted with investors both before and after investment,  traveled to Europe with Mr. Thornburgh to meet with Henriette and supposed bank contacts, hosted at least one meeting of investors at his home, drafted and furnished lulling progress reports, provided bonds, picked up bonds from escrow, supplied the names of "authenticators," and sold or attempted to sell both railroad and Chinese bonds.  He and Mr. Thornburgh shared $108,000 or more, paid directly to them by one investor supposedly to defray ongoing personal expenses allegedly relating to the bond program.  R. Vol. 3 (7 of 8) at 837.

That investor, Dr. Wayne Maltz, described his investment experience as follows:  There was a lot of correspondence, faxes and e-mails, "mostly . . . written by Mr. Fishman" about the program.  "Mr. Fishman came into the picture to tell us how these bonds were going to be placed."  Id. at 808.  Another witness, an investor's CPA, described the sales process this way:

A.  Well, Mr. Thornburgh – I would characterize him as the salesperson. . . . [H]e's the one that brought the parties to the table. And then later, we were introduced to Mr. Fishman, who then would reiterate the mechanics of the deal.  And that's how we got knowledge of the next level of the investment.

. . .

A.  We would be on the phone with Mr. Thornburgh, and we would ask pointed questions.  And he would always then refer us to Mr. Fishman, who did have the answers to the more technical questions.

Id. at  921-22.

. . .

A.  [L]ater [after no payments were received] we started calling Bob Searles.  And Bob Searles actually was the only one that seemed to try to help, quite frankly.

Id. at 933.

In 2002, Messrs. Thornburgh and Searles parted ways.  However, Mr. Fishman maintained relationships with both, and both remained involved in the bond program.

The conspiracy ran to mid-2005.  During its life no bonds were placed with a financial institution, no lines of credit were granted, no trading programs, high-yield or otherwise, were established, no profits or other returns were realized, and no payments to investors were made under the terms of their agreements with Caribou.[2]  The total number of victims exceeded 250, and the total known loss

---

[2]Small payments out of money paid in by later investors were made to some investors who applied sufficient pressure.  While those payments could be

(continued...)

was $4,057,846.26.[3]  Mr. Fishman received a total of $343,629.50 personally from the Caribou program.

## II.    Cooperation by Fishman

The conspiracy came to a halt following a lengthy investigation that started with a complaint by an investor to the United States Postal Inspection Service in the Northern District of Oklahoma in early 2003.  The complainant said she had made an investment in the Caribou program but had not received what she had been promised.  Several U.S. federal agencies joined in the investigation, as well as an agency in New Zealand.  Postal Agent Albert Chapa and IRS Agent Katherine Beckner were the primary initial investigators in Oklahoma.  This investigation led to the indictment against Mr. Fishman and his co-conspirators, first filed in November 2007.

While the investigation was being pursued in Oklahoma, a similar inquiry was being conducted in Illinois into the activities of Peter Zaccagnino, with whom Fishman as well as Thornburgh and Searles had been associated.  Mr.

---

[2](...continued)
characterized as Ponzi-like, they were often labeled as loans, and probably were more in the nature of a partial return of investment monies since they bore no relationship to promised profits on investment.

[3]The United States postal inspector who initially investigated complaints about the Caribou conspiracy testified that there were twenty investors in the United States and 490 international investors, mostly from New Zealand, where co-conspirator Mr. Davidson lived and operated.

Fishman testified before the grand jury in Illinois without raising his Fifth Amendment right against self-incrimination at any point. The investigating authorities assured Mr. Fishman he was not, at that time, a target of the investigation; rather he was a fact witness providing information about the fraudulent scheme to sell railroad bonds. Additionally, at no time was Mr. Fishman granted immunity of any kind for his testimony. Investigators in Illinois then talked with the investigators of the Caribou program in Oklahoma, and they told the Oklahoma investigators that Mr. Fishman had been cooperating. Agent Chapa estimated that Mr. Fishman turned over to him approximately 5,000 documents relating to the Caribou program.

At some point after Mr. Fishman had turned over his bonds as part of the documents he provided to the investigating authorities, he sought the return of the bonds from Agent Chapa. They were returned to Mr. Fishman. Subsequently, pursuant to Agent Chapa's request, Mr. Fishman gave the bonds back after Agent Chapa told Mr. Fishman that returning the bonds would be an act of good faith.

Meanwhile, on June 7, 2004, Mr. Fishman received a subpoena to testify before a grand jury in the Northern District of Oklahoma. The subpoena did not contain an advice of rights, and Mr. Fishman was not identified as a target of the investigation being conducted at that time. When Mr. Fishman received a second subpoena, dated August 24, 2006, it *was* a target subpoena identifying him as a target of the investigation and it did contain an advice of rights. Among the

"rights" listed was the following: "You are notified that you are a target of an investigation for possible violations of federal criminal law." Id. at 210.

That same day, Mr. Fishman sent an e-mail to Assistant United States Attorney ("AUSA") Kevin Leitch in Oklahoma, stating his concern about the advice of rights, reminding Mr. Leitch of Mr. Fishman's full cooperation and stating that he did not intend to hire counsel. He further expressed his hope that, after his grand jury testimony, the authorities would cease viewing him as a target.

When Mr. Fishman appeared before the grand jury on September 6, 2006, he declined to invoke his Fifth Amendment right against self-incrimination. He did not receive immunity for his testimony. He alleges that he testified and incriminated himself. Agent Chapa subsequently testified that, throughout the investigation, Mr. Fishman had expressed his concern about his status as a potential target, and repeatedly asked the agent if he would be charged with a crime. Agent Chapa stated that he never offered Mr. Fishman a "deal" or immunity of any kind, nor did he have the authority to do so.

When Mr. Fishman made another trip to Tulsa in February 2007 to meet with Agent Chapa and AUSAs Leitch and Charles McLoughlin, he was handed a letter notifying him that he was a target of a federal investigation. AUSA McLoughlin told Mr. Fishman that he could be charged with a crime. Mr. Fishman indicated he still wanted to cooperate. Agent Chapa drove Mr. Fishman

-10-

to the Federal Public Defender's office in Tulsa, where counsel was appointed to represent Mr. Fishman.

## III.    Subsequent Proceedings

Subsequently, Mr. Fishman, along with Mr. Thornburgh, went to trial on a second superseding indictment, filed on June 2, 2009, alleging a conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. §§ 1341, 1343, and 1349, and a conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i), (h), and 1957(a).  Count one addressed the promotion and sale of the bonds, whose value was vastly overrepresented and promised returns falsified.  Count two addressed the distribution of funds through the SunTrust account to Mr. Fishman and his fellow co-conspirators.  Messrs. Fishman and Thornburgh were also subject to forfeiture under 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c).[4]

Mr. Fishman filed a host of pre-trial motions, all of which were denied. We address each one as it is relevant to the issues Mr. Fishman raises on appeal. Those issues are:  (1) the district court erred in denying his motion to dismiss the indictment as being the fruit of effectively immunized statements; (2) there was

---

[4]While Mr. Fishman and Mr. Thornburgh were tried together, Mr. Searles pled guilty.  Mr. Searles' recent challenge to his sentence was rejected by this court on direct appeal.  United States v. Searles, 2011 WL 488750 (10th Cir. Feb. 11, 2011).

insufficient evidence to support his convictions on both counts one and two;

(3) there was a fatal variance from the indictment because the indictment alleged

one conspiracy but the evidence at trial established multiple conspiracies; (4) the

applicable statute of limitations had expired by the time the indictment was filed;

(5) the jury instructions on money laundering were erroneous; and (6) the district

court erred in its application of the sentencing guidelines and in its selection of

the amount for restitution. Acting *pro se*, Mr. Fishman adds the issue that his

conviction violates the *Ex Post Facto* clause of the United States Constitution.[5]


## DISCUSSION

### I.    Motion to Dismiss Indictment Stemming from Allegedly Immunized Statements

Mr Fishman argues that he believed that his substantial cooperation with

the investigating authorities, including his taking certain actions which he was

assured were viewed as "good faith" conduct, would implicitly provide him with

---

[5]During the pendency of this appeal, we permitted Mr. Fishman's first court-appointed attorney, Stanley D. Monroe, to withdraw after he filed Mr. Fishman's opening brief. Mr. Monroe was replaced by a second court-appointed attorney, J. Lance Hopkins, who filed a reply brief for Mr. Fishman. Mr. Hopkins was also permitted to withdraw as counsel, pursuant to Mr. Fishman's request, and we permitted Mr. Fishman to proceed on appeal *pro se*. Mr. Fishman then filed his own *pro se* reply brief, and asked that we strike from the record Mr. Hopkins' reply brief. We did so. See 11/4/10 Order at 2 ("The reply brief filed by attorney Hopkins is stricken."). We therefore do not consider the arguments made by Mr. Hopkins in his reply brief.

immunity from prosecution.  He accordingly filed a pre-trial motion to dismiss the indictment because it was based on statements he had made before the grand jury and/or to authorities in other contexts, which he claims were effectively immunized because of that substantial cooperation.  Following an evidentiary hearing, the court denied the motion, stating:

> Defendant's subjective belief that he would not be prosecuted simply because he cooperated with the investigation was unreasonable, and he has not made a prima facie showing that he had any type of agreement with investigators or the United States Attorney's office that would prevent him from being charged with a crime in this case. . . .  There is no credible evidence that defendant had an express or implied immunity agreement, nor is there any evidence that defendant entered an agreement with the United States Attorney's office to reduce or eliminate his potential criminal liability.

Op. & Order at 11, R. Vol. 1, Part 2 at 216.[6]  We review the district court's decision whether to dismiss an indictment for abuse of discretion.  United States v. Alcarez-Arellano, 441 F.3d 1252, 1265 (10th Cir. 2006).

"Congress has authorized the grant of use immunity to those persons ordered to testify before a grand jury."  United States v. Lacey, 86 F.3d 956, 972

---

[6]There are two types of immunity for a witness—use immunity and transactional immunity.  Use immunity "confers immunity only against the use of testimony compelled under the immunizing order; it does not confer transactional immunity under which the witness could not be prosecuted at all for the transactions about which he testifies."  In re Madison Guar. Sav. & Loan, 352 F.3d 437, 443 (C.A. D. C. 2003) (per curiam); see also United States v. Gutierrez, 696 F.2d 753, 756 n.6 (10th Cir. 1982) ("[F]or purposes of constitutional doctrine use immunity is a subset of transactional immunity.").

(10th Cir. 1996). However, "[T]he United States attorney and his superiors have the sole power to apply for immunity." United States v. Serrano, 406 F.3d 1208, 1217 (10th Cir. 2005).

If "a defendant shows that he or she has been compelled to testify under a grant of use immunity about a matter relevant to his or her prosecution, the burden then shifts to the government to demonstrate that 'all of the evidence it proposes to use was derived from legitimate independent sources.'" Id. (quoting Kastigar v. United States, 406 U.S. 441, 461-62 (1972)). Mr. Fishman claims he did, in effect, testify under a grant of use immunity, so he argues the government must prove that all of the evidence it used to convict him was derived from legitimate independent sources. We disagree.

In this case, it is clear that Mr. Fishman did not invoke his Fifth Amendment privilege to refuse to testify before the grand jury. And, despite his many allusions to immunity, it is also clear that no one with the authority to grant him use immunity did so. While he claims he thought asserting his Fifth Amendment right against self-incrimination was merely a formality, the reality is that his silence regarding that right indicates he waived it and testified without the benefit of an immunity agreement.

Mr. Fishman also emphasizes Agent Chapa's statement that he would be demonstrating "good faith" by returning the bonds to the authorities; but that falls far short of an expression of immunity. Agent Chapa made it clear, in any event,

-14-

that he lacked authority to grant immunity. The district court accordingly did not err in refusing to dismiss the indictment, or in permitting Mr. Fishman's grand jury testimony to be admitted at trial.

## II.     Sufficiency of the Evidence

Mr. Fishman made an oral motion pursuant to Fed. R. Crim. P. 29 at the close of the government's case, and after all parties rested, for acquittal based on the insufficiency of the evidence. He renewed the motion after the verdicts were announced. The district court denied the motions on each occasion.

"We review a challenge to the sufficiency of the evidence *de novo*, but in doing so we owe considerable deference to the jury's verdict." United States v. King, 632 F.3d 646, 650 (10th Cir. 2011) (further quotation omitted). We ask only "whether taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury would find the defendant guilty beyond a reasonable doubt." Id. (further quotation omitted). In conducting this review, we do not "weigh conflicting evidence or consider witness credibility, as that duty is delegated exclusively to the jury." Id. (further quotation omitted).

**A. Count One: Conspiracy to Commit Mail and/or Wire Fraud**

We begin with the question of whether there was sufficient evidence to support the jury's guilty verdict as to count one, conspiracy to commit wire and mail fraud. First, a conspiracy to commit wire and/or mail fraud does not require proof of an overt act. See Whitfield v. United States, 543 U.S. 209 (2005) (holding that criminal conspiracies modeled after the Sherman Act, 15 U.S.C. § 1, rather than 18 U.S.C. § 371, do not require proof of an overt act to obtain conviction).

Accordingly, to prove such a conspiracy, the government must demonstrate that "(1) two or more persons agreed to violate the law, (2) the defendant knew the essential objectives of the conspiracy, (3) the defendant knowingly and voluntarily participated in the conspiracy, and (4) the alleged coconspirators were interdependent." United States v. Baldridge, 559 F.3d 1126, 1136 (10th Cir.) (further quotation omitted), cert. denied, 129 S. Ct. 2170 (2009).

Turning to the substantive crime, "[t]o convict a defendant of wire fraud, the government must prove three elements: (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme." United States v. Caldwell, 560 F.3d 1214, 1218 (10th Cir. 2009) (further quotation omitted).[7]

---

[7]"Because the requisite elements of the two statutes [mail fraud and wire

(continued...)

Mr. Fishman argues "[t]he evidence failed to show that Mr. Fishman shared a common goal with the alleged co-conspirators, since the proof did not establish that Mr. Fishman was aware of the objects of the alleged mail and wire fraud conspiracy." Opening Br. of Appellant at 53. He claims he made no false statements to any of the Caribou investors, that he believed the bonds were valuable, that he was merely a messenger between the investors and the other members of the conspiracy, and that he made no money from the sale of bonds to the Caribou investors. In short, he claims he acted in good faith, merely trying to help people get rich quickly.

We have carefully reviewed the lengthy record in this case. There is an abundance of evidence establishing that Mr. Fishman was deeply involved in the entire fraudulent conspiracy to commit mail and wire fraud, and that he was, as the government characterized it, "the neural glue of the conspiracy." Answer Br. of the United States at 41. Interdependence was clearly proven, as was Mr. Fishman's awareness of all aspects of the fraudulent plan. It simply defies belief that a reasonable juror would conclude that Mr. Fishman could be so integrally involved in every aspect of the Caribou program and watch as months went by

_____

[7](...continued)
fraud] are virtually identical, this court has held '[i]nterpretations of § 1341 are authoritative in interpreting parallel language in § 1343.'" United States v. Weiss, 630 F.3d 1263, 1271 n.5 (10th Cir. 2010) (quoting United States v. Lake, 472 F.3d 1247, 1255 (10th Cir. 2007)). Thus, the elements for mail fraud are essentially the same as those stated for wire fraud.

-17-

with no investors receiving their promised extravagant returns, and yet have no idea that the entire program was a fraudulent scheme.

Most telling, however, is Mr. Fishman's admission in his testimony before the grand jury that, by early 2000, he knew that the bonds had no real value and that the program was "bogus." R. Addendum Vol. 13 at 5021, 5038. Yet, the record is replete with evidence of his continuing efforts to pacify increasingly angry investors with further misrepresentations and misleading statements, and to solicit new investors. In sum, there was ample evidence supporting the jury's guilty verdict as to count one, particularly in view of the deference we give to the jury's verdict. "[A]ny rational trier of fact could have found [Mr. Fishman] guilty of the crime beyond a reasonable doubt." United States v. Wood, 207 F.3d 1222, 1228 (10th Cir. 2000).

### B. Conspiracy to Commit Money Laundering

Mr. Fishman also claims there was insufficient evidence supporting the jury's guilty verdict on count two, conspiracy to commit money laundering. Conspiracy to launder money requires proof "(1) that there was an agreement between two or more persons to commit money laundering and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose." United States v. Wittig, 575 F.3d 1085, 1103 (10th Cir.

2009) (quoting United States v. Fuchs, 467 F.3d 889, 906 (5th Cir. 2006)).  To

establish the crime of money laundering:

> the government must prove four elements:  (1) that the defendant
> knowingly conducted a financial transaction; (2) that the funds
> involved were proceeds of a specified unlawful activity; (3) that the
> defendant knew that the funds involved were proceeds of that
> unlawful activity; and (4) that the transaction was designed to
> conceal the nature, location, source, ownership, or control of the
> proceeds.

Caldwell, 560 F.3d at 1221.  In this case, the "specified unlawful activity" was

the mail and/or wire fraud.

Mr. Fishman devotes a single paragraph using one-half of a page in his

opening brief to his argument that there was insufficient evidence supporting the

jury's guilty verdict on the money laundering count.  He simply reminds us to

remember the distinction between "money laundering" and "money spending"

(and inferentially the distinction between profits and receipts) in light of the

recent Supreme Court case United States v. Santos, 553 U.S. 507 (2008).  He thus

alleges, without development or support, that "[t]he focus must be on the criminal

profits, not receipts."  Opening Br. of Appellant at 57.  Finally, he notes, again

without elaboration, that our decision in Caldwell is "helpful."  Id.  He fails to

explain which element of the conspiracy charge or the money laundering charge

the government failed to prove.  Fed. R. App. P. 28(a) states that the "appellant's

brief *must contain* . . . the argument, which *must contain*: . . . appellant's

contentions and the reasons for them, with citations to the authorities and parts of

-19-

the record on which the appellant relies." Fed. R. App. P. 28(a)(9)(A) (emphasis added). Mr. Fishman's opening brief on this point is woefully inadequate.[8] Nonetheless, were we to address the issue of the sufficiency of the evidence for a guilty verdict on the conspiracy-to-money-launder count, we would find the evidence more than sufficient.

The record reveals ample evidence of the interdependence and constant communication between Mr. Fishman and his co-conspirators. These communications reveal Mr. Fishman's awareness of every aspect of the Caribou program, from the true value of the bonds, to the reality of where the investors' money was going, to the fact that there were no high-yield trading programs operated by major European banks for the benefit of the Caribou investors, and to the fact that the promised returns to investors were non-existent. Furthermore, Mr. Fishman was fully aware that some investor deposits were used by the conspirators to lull restless and suspicious investors into believing that the conspirators were busily trying to keep the program afloat and capable of

_____

[8]Additionally, citations to the lengthy record in this case are marginally helpful. Few of the citations relate to the actual location in the record of the material being cited.

We note that arguments regarding sufficiency of the evidence are only made by Mr. Fishman's counsel, in the opening brief. In Mr. Fishman's *pro se* reply brief, he makes no argument at all about sufficiency of the evidence. He does, however, address the <u>Santos</u> issues of profits vs. receipts in the context of the propriety of the jury instructions in this case. We address that as a separate appellate argument, *infra*.

-20-

generating sums of money.  Other investor deposits were being distributed through the SunTrust account and Caribou to the co-conspirators, including to Mr. Fishman himself.

Once again, it defies belief that a reasonable juror would find that, given Mr. Fishman's involvement in every aspect of the Caribou program, he was nonetheless somehow unaware of the true nature of the program, and that it was, in fact, a fraudulent scheme involving mail and wire fraud and money laundering. In sum, as we stated above with respect to count one, "[A]ny rational trier of fact could have found [Mr. Fishman] guilty of the crime beyond a reasonable doubt." Wood, 207 F.3d at 1228.

Mr. Fishman's brief also cites to Santos.  In that regard, he focuses in a conclusory fashion on profits versus receipts.  Because he did not raise this issue below, we review the question under a plain error standard.  See United States v. Goode, 483 F.3d 676, 681 n.1 (10th Cir. 2007).

For the reasons stated in greater detail, *infra*, when we discuss the propriety of the jury instructions on money laundering, we conclude that even assuming, arguendo, that some error occurred on this subject with respect to the sufficiency of the evidence, that error did not constitute plain error.

## III.   Variance—One vs. Many Conspiracies

The second superseding indictment alleged a single conspiracy to commit mail and wire fraud and launder the proceeds.  Mr. Fishman "contends that there were a minimum of three . . . or more conspiracies demonstrated at trial.  Some of the players were Sloan DuPont, Terry Nelson, David Watson, Peter Zaccagnino, Deno Nerozzi, Sam Kram, Mr. Davidson, Mr. Searles, Mr. Thornburgh, among others."  Opening Br. of Appellant at 58.  In his reply brief, Mr. Fishman makes a more specific argument, alleging that there were at least three separate conspiracies—one involving Mr. Zaccagnino, the Caribou program, and the Chinese bond conspiracy involving Norah Cali, the claimed niece of Alan Greenspan.  He suggests there was perhaps a fourth "activity," which he claims was not a conspiracy at all, involving the purchase of bonds from Mr. Fishman by a woman named Barbara Johnson.  Mr. Fishman concedes that perhaps the Zaccagnino conspiracy was "peripheral" to the Caribou scheme, but steadfastly maintains the others were entirely separate.  Mr. Fishman failed to raise this issue in his Rule 29 motion below.

"Where 'an indictment charges a single conspiracy, but the evidence presented at trial proves only the existence of multiple conspiracies,' a variance occurs."  United States v. Caldwell, 589 F.3d 1323, 1328 (10th Cir. 2009) (quoting United States v. Carnagie, 533 F.3d 1231, 1237 (10th Cir. 2008)).  In reviewing a claimed variance, "'we view the evidence and draw all reasonable

inferences therefrom in the light most favorable to the government, asking whether a reasonable jury could have found [the defendant] guilty of the charged conspirac[y] beyond a reasonable doubt." Id. (quoting Carnagie, 533 F.3d at 1237). We consider the "existence of a variance that would support acquittal [a]s a matter of law that we review de novo." Id. (citing United States v. Griffin, 493 F.3d 856, 862 (7th Cir. 2007) ("We treat a conspiracy variance claim as an attack on the sufficiency of the evidence supporting the jury's finding that each defendant was a member of the same conspiracy.")).

Because it is difficult to distinguish between a single large conspiracy and several smaller conspiracies, "we will generally defer to the jury's determination of the matter." Id. at 1329. In reviewing a jury finding that a single, rather than multiple, conspiracy existed, "a focal point of the analysis is whether the alleged coconspirators' conduct exhibited interdependence." United States v. Edwards, 69 F.3d 419, 432 (10th Cir. 1995). Co-conspirators are interdependent when they "inten[d] to act *together* for their *shared mutual benefit* within the scope of the conspiracy charged." United States v. Evans, 970 F.2d 663, 671 (10th Cir. 1992). "Circumstantial evidence alone is often sufficient to demonstrate interdependence; indeed, it is often the only evidence available to the government." Caldwell, 589 F.3d at 1329. Moreover, "a single act can be sufficient to demonstrate interdependence." Id.

In this case, there was substantial evidence of interdependence. Indeed, each member of the conspiracy had his own particular role—Mr. Thornburgh and Mr. Davidson were the salesmen of the bonds, Mr. Thornburgh in the United States and Mr. Davidson abroad, primarily in New Zealand and Australia; Mr. Searles was the banker and organizer, having established Caribou as the shell corporation and serving as its president; a man named John Clancy was the "authenticator," charged with ensuring the purported authenticity of the bonds; Mr. Fishman was a central figure, interacting with all of the other conspirators and performing many essential functions. There were occasional modifications of personnel and product. Mr. Zaccagnino dropped out of the conspiracy when he closed Two-Thirds International.[9] The focus of the bonds shifted from railroad bonds to Chinese bonds as the conspiracy wore on. But the record is replete with evidence that the conspirators operated in a very interdependent and complementary way. Even when Mr. Thornburgh and Mr. Searles had a falling out of some kind, they continued to operate within the conspiracy, with Mr. Fishman operating as a go-between.[10]

---

[9]Mr. Zaccagnino apparently was under investigation by the Securities and Exchange Commission.

[10]Mr. Searles testified as follows:

> Q. Okay. So is there, then, a falling-out between you and Mr. Thornburgh?
> A. Yes.

(continued...)

As we have stated before:

The goals of all the participants need not be congruent for a single conspiracy to exist, *so long as their goals are not at cross purposes*. . . . [A] single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or

---

[10](...continued)

Q. And when that falling-out takes place, where does Mr. Fishman land?

A. I guess in the middle. He's still doing business with both of us, as far as I know.

Q. All right. And are you still making contact with the investors, the American investors?

A. Yes.

Q. To your knowledge, is Mr. Thornburgh still making contact with those American investors?

A. I don't know. Some of them told me they had tried to reach him. Some of them told me they had reached him . . . .

. . . .

Q. And did you do anything in writing with [the] American investors? Bringing ourselves up to March of '03.

A. Yes.

Q. What did you do?

A. As time is progressing on, by December [2002], I'm beginning to get written demands to me with some of these American investors to get back their money. So by January, the pressure is building. So I told Mr. Fishman . . . something has got to happen. So he said, well, Mr. Thornburgh has entered into a hold harmless agreement with someone, and . . . I think this will help you . . . .

. . . .

So he sent me a copy of the document he had drawn up for Mr. Thornburgh. So I took that document, and I revised it for my own needs with my 15 investors, and I sent it to Mr. Fishman. And he critiqued it for me and sent it back to me. And I executed it with the 15 people. And basically, I said, if I give you back your money, I don't owe you anything else.

Tr. of Trial Proceedings at 1266, 1269, R. Vol. 3, Part 8.

more phases or spheres of operation, *so long as there is sufficient proof of mutual dependence and assistance.*

United States v. Harrison, 942 F.2d 751, 756 (10th Cir. 1991) (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 963 (2d Cir. 1990)). The common denominators in all these "programs" were Mr. Fishman, Mr. Thornburgh and Mr. Searles. They may have had greater or lesser involvement with particular investors, but they all used similar paperwork and tactics—"safekeeping depositories," bonds (first railroad, then Chinese), bond "authenticators," and foreign "program managers." A single conspiracy does not splinter into multiple conspiracies because members come and go. See United States v. Coleman, 7 F.3d 1500, 1503 (10th Cir. 1993) (finding sufficient evidence of defendant's participation in conspiracy even though she began her participation in the conspiracy two years after venture had begun, participated for only two months, and the conspiracy continued for six months after she was arrested); United States v. Brewer, 630 F.2d 795, 800 (10th Cir. 1980) ("A conspiracy is not terminated simply by a turnover in personnel.").

Mr. Fishman also claims the government used evidence of conduct for which he was never criminally charged, and suggests this somehow indicates there were multiple conspiracies or a prohibited variance. He also appears to argue that, because Mr. Zaccagnino and Norah Cali were not charged as members of the Caribou conspiracy, any activity he had with them was pursuant to a

-26-

separate conspiracy or conspiracies. We disagree. The second superseding indictment specifically stated that there were more conspirators, "known and unknown," and the fact that not all were charged does not necessarily mean they operated in a separate conspiracy. As we have stated before:

> The government need not show that each conspirator knew of or had contact with all other members. Nor need it show that the conspirators knew all of the details of the conspiracy or participated in every act in furtherance of the conspiracy. Changes in the cast of characters do not preclude a finding of a single overarching conspiracy.

United States v. Smith, 413 F.3d 1253, 1276 (10th Cir. 2005) (quoting United States v. Soto-Beniquez, 356 F.3d 1, 10 (1st Cir. 2004)), overruled on other grounds, United States v. Hutchinson, 573 F.3d 1011 (10th Cir. 2009).

Accordingly, we find no evidence of a variance; rather, the record amply supports the jury's determination that there was only a single conspiracy.[11]

## IV.    Statute of Limitations

Mr. Fishman argues that the five-year statute of limitations applicable to the charges here had expired by the time the initial indictment was filed on November 30, 2007. He thus argues that the court should have granted his motion to dismiss the indictment.

---

[11]Mr. Fishman does nothing to explain how the list of names he provided in his opening brief demonstrates the existence of multiple conspiracies. He provides slightly more explanation in his reply brief.

"A conspirator . . . is only liable for the acts of co-conspirators until the conspiracy accomplished its goals or that conspirator withdraws." United States v. Cherry, 217 F.3d 811, 817 (10th Cir. 2000) (further quotation omitted). Mr. Fishman argues that the conspiracy here was "complete when the main criminal objectives were achieved, the receipt of the funds from the investors in 2002 and before." Opening Br. of Appellant at 62.

As indicated above, "a conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy." Whitfield, 543 U.S. at 219; United States v. Green, 599 F.3d 360, 372 (4th Cir. 2010) ("We are mindful that, . . . a money laundering conspiracy does not require proof of an overt act."). Nonetheless, while not required,

> proof of overt acts can be useful for, among other things:
> (1) showing that a conspiracy begun more than five years before the return of an indictment continued into a period within the statute of limitations; [or] (2) showing that a particular defendant knowingly joined (or remained a member of) a conspiracy.

Green, 599 F.3d at 372. And, as we stated above, conspiracy to commit wire and/or mail fraud also does not require proof of an overt act.

Furthermore, for "'conspiracy statutes that do not require proof of an overt act, the indictment satisfies the requirements of the statute of limitations if the conspiracy is alleged to have continued into the limitations period.'" United States v. McNair, 605 F.3d 1152, 1213 (11th Cir. 2010) (quoting United States v.

Gonzalez, 921 F.2d 1530, 1548 (11th Cir. 1991) (citation and quotation marks omitted)). Whether we look just at the indictment or also consider proof of the conduct of Mr. Fishman, it is clear that the indictment against him was not barred by the statute of limitations.

The second superseding indictment specifically states with respect to count one, "Beginning at least as early as 1998 and continuing at least through August 2005, the exact dates being unknown to the Grand Jury, . . . Defendants JOSEPH LYNN THORNBURGH, WAYNE LESLIE DAVIDSON, STEVEN FISHMAN and others . . . knowingly and willfully conspired to [commit mail and wire fraud]." Second Superseding Indictment at 3. It further specifically lists incidents in 2003 and 2005 in which members of the conspiracy did particular acts in furtherance of the conspiracy. See id. at 11. Count two contains the identical language regarding conspiring to commit money laundering. Thus, the indictment squarely places the conspiracy within the five-year statute of limitations.

Furthermore, the actions of the co-conspirators listed in the indictment are amply supported in the record. Other evidence also demonstrates activity by the co-conspirators until 2005, as evidenced by the following recitations of testimony from several investors. For example, investors Henry Pham and David Franco testified to contacts with Mr. Thornburgh and Mr. Fishman in 2003 and 2004. Investor Tracey Grist testified about an e-mail she received in January 2004 from

-29-

Mr. Fishman. Yet another investor, Barbara Johnson, testified that she wired $13,000 to Mr. Fishman in April 2004, sent him a check for $50,000 in August 2004, sent him another check for $20,000 in October 2004, and then made a wire transfer for $22,000 in January 2005. Ms. Johnson also described many telephone conversations she had with Mr. Fishman in March, April and May of 2005. Investor Marsha Longaberger described interactions with Mr. Thornburgh in March and April 2003, relating to her investment, including Mr. Thornburgh's request in April that she lie to the postal inspector investigating the Caribou program. Investor Jeff Hayslett also described an "end of 2002, maybe beginning of 2003" telephone conversation with Mr. Fishman, one of many such conversations he had with Mr. Fishman. Tr. of Trial Proceedings, Fishman Record, Vol. 3, Part 7 at 964.[12] Investor Dr. Wayne Maltz testified that, in late 2002, on numerous occasions in 2003, and on a few occasions in 2004 and 2005, he had, at Mr. Thornburgh's request, paid for Mr. Thornburgh's living expenses and hotel debt allegedly incurred while Mr. Thornburgh was in Europe following through on the bond investments. On at least one of these occasions in December 2002 and January 2003, Mr. Fishman was with Mr. Thornburgh in Europe. Some of these payments were characterized by Mr. Thornburgh as necessary to keep the

_____

[12]Mr. Hayslett testified about a telephone conversation he had with Mr. Fishman in December 2003, in which he apparently told Mr. Fishman that he realized the whole endeavor was a sham and he wanted his money back. Tr. of Trial Proceedings, Fishman Record, Vol. 3 (Part 7 of 8) at 981.

whole bond enterprise afloat. Dr. Maltz also testified that he received many faxes from Mr. Fishman and had many telephone conversations with him telling Dr. Maltz how the bonds were going to be placed. All of this evidence shows activity by Mr. Fishman and his co-conspirator Mr. Thornburgh well into the statute of limitations time period.

Mr. Fishman also argues that the disagreement between Mr. Thornburgh and Mr. Searles in July 2002 somehow indicates that the conspiracy had ended. That is contradicted by the wealth of evidence that Mr. Fishman and Mr. Thornburgh and others were continuing to pacify and solicit current and new investors all the way through early 2005. Furthermore, that evidence demonstrates that Mr. Fishman simply became the middleman between Mr. Thornburgh and Mr. Searles, not that the conspiracy ended.

Finally, a reasonable jury could have concluded that a number of communications between Mr. Fishman and investors were lulling letters, "designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place." United States v. Maze, 414 U.S. 395, 403 (1974); see also S.E.C. v. Holschuh, 694 F.2d 130, 144 n.24 (7th Cir. 1982) (holding that for mail fraud and securities fraud, "[a] scheme to defraud may well include later efforts to avoid detection of the fraud . . . . Avoidance of detection and prevention of recovery of the money lost by the

victims are within, and often a material part of, the illegal scheme. Further profit from the scheme to defraud, as such, may be over, and yet the scheme itself may not be ended.") (further quotation omitted)). We accordingly conclude that the statute of limitations provides no defense for Mr. Fishman.

## V.    Jury Instructions

Mr. Fishman next argues that the district court gave an erroneous jury instruction when it failed to define the term "proceeds" in the money-laundering jury instruction as "profits." See 18 U.S.C. § 1956(a)(1)(A)(i).[13]

---

[13]The relevant money laundering statute, 18 U.S.C. § 1956(a)(1), stated as follows at all times relevant to this case:

> Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity . . . (A)(i) with the intent to promote the carrying on of specified unlawful activity . . . shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

The statute has since been amended (in 2009) so that "proceeds" is now defined as "any property derived from or obtained or retained, directly or indirectly, through some form of unlawful activity, including the gross receipts of such activity." 18 U.S.C. § 1956(c)(9). But because all the relevant activities in this case occurred before 2009, we apply the old version of the money laundering statute.

Mr. Fishman failed to object to the jury instruction, so we review it only for plain error. See United States v. Vonn, 535 U.S.55, 59 (2002); see also Searles, 2011 WL 488750, at *1 (Mr. Fishman's co-defendant making the identical Santos argument). "Plain error occurs when there is (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." United States v. Gonzalez-Huerta, 403 F.3d 727, 732 (10th Cir. 2005) (en banc) (internal quotation marks omitted). An error is "plain" if it is "clear or obvious under current law" and "contrary to well-settled law." United States v. Whitney, 229 F.3d 1296, 1308-09 (10th Cir. 2000). "In general, for an error to be contrary to well-settled law, either the Supreme Court or this court must have addressed the issue." United States v. Ruiz-Gea, 340 F.3d 1181, 1187 (10th Cir. 2003).

The district court's jury instruction used the term "proceeds" and then stated that "'proceeds' can be any kind of property, not just money." Jury Instructions at 80. Now, relying on Santos, Mr. Fishman argues that the government was obligated to prove that profits from the mail and wire fraud, not just receipts or gross receipts, were laundered. He further alleges that proof of profits was neither pled nor proven, and that the district court's jury instructions were erroneous because they did not require proof of profits.

We are releasing simultaneously with this decision our decision regarding Mr. Thornburgh, one of Mr. Fishman's co-conspirators and his co-defendant at

-33-

trial.  <u>United States v. Thornburgh</u>, No. 09-5156 (10th Cir. May 27, 2011).  As we

explained in <u>Thornburgh</u>, the <u>Santos</u> decision has been interpreted by lower courts

in many different ways.  We have therefore confined it to its factual setting, and

conclude that "proceeds" means "profits" for the purpose of the money laundering

statute *only* where an illegal gambling operation is involved.  Alternatively,

assuming that <u>Santos</u> dictates that it was error in this case to not require proof of

profits, that error cannot be *plain*, in view of the widely differing interpretations

of <u>Santos</u>.  See <u>United States v. Parra</u>, 2011 WL 728088 (10th Cir. March 3,

2011) (unpublished); <u>Searles</u>, 2011 WL 488750).  We therefore conclude that the

district court did not err when, in its instructions to the jury, it failed to define

"proceeds" as "profits" in connection with the Caribou conspiracy.  Mr.

Fishman's argument based on the jury instructions therefore lacks merit.

## VI.    Application of Sentencing Guidelines and Restitution

Mr. Fishman makes a very abbreviated argument that the district court

erred in its application of the sentencing guidelines as well as the imposition of

the amount of restitution ordered.  He appears to argue that the amount of loss

attributed to him resulted in an unreasonable sentence and an unfair amount of

restitution.  But he provides no explanation of why, and/or how much loss he

thinks is properly attributable to him.  "We will not manufacture arguments for an

appellant, and a bare assertion does not preserve a claim, particularly when, as

-34-

here, a host of other issues are presented for review." Craven v. University of Colorado Hosp. Auth., 260 F.3d 1218, 1226 (10th Cir. 2001) (further quotation omitted). Because he fails to develop this argument or provide any citations to authorities or the record, we do not address it.

## VII. Ex Post Facto/Due Process Violation

Proceeding *pro se*, Mr. Fishman argues that his conviction for count one (conspiracy to commit mail and wire fraud), in violation of 18 U.S.C. § 1349, must be vacated because it contravenes the Ex Post Facto clause of the United States Constitution. More specifically, he argues that, because one of the statutes of conviction, 18 U.S.C. § 1349, did not go into effect until July 30, 2002, it is a violation of the Ex Post Facto clause to convict him on the basis of conduct which occurred before that date. He did not raise this issue below, so we review for plain error.

We begin by noting that the Supreme Court has recently clarified the nature of this claimed constitutional violation. In United States v. Marcus, 130 S. Ct. 2159 (2010), there was a situation similar to our case, in that the defendant had been convicted of conduct (violation of the sex trafficking and forced labor statutes) occurring both before and after the effective date of the statutes making that conduct illegal. The defendant had not objected to the district court's failure to address this issue, by means of a jury instruction or some other means, so

appellate review before the Second Circuit and the Supreme Court was for plain error. The Second Circuit and the defendant had characterized this as an Ex Post Facto Clause violation. The Supreme Court disagreed with that characterization, stating that it is actually a due process question. "[I]f the jury, which was not instructed about the [statute's] enactment date, erroneously convicted [defendant] based exclusively on noncriminal, preenactment conduct, [defendant] would have a valid due process claim." Id. at 2165.[14]

Then, examining the familiar plain error standard, the Supreme Court stated there was "no reason why this kind of error would automatically 'affect substantial rights' without a showing of individual prejudice." Id. The Court therefore remanded the case back to the Second Circuit for it to apply the plain error standard to the facts of that case, following the Supreme Court's guidance.

On remand, the Second Circuit applied the plain error test and, at the third step of the test (whether the error affected the appellant's substantial rights) the court required the defendant to "demonstrate that the error was prejudicial," noting that ordinarily, an error is prejudicial "where there is a reasonable probability that the error affected the outcome of the trial." United States v. Marcus, 628 F.3d 36, 42 (2nd Cir. 2010) (further quotation omitted). The court

---

[14]The Court explained why the Ex Post Facto Clause is not involved: "'The *Ex Post Facto* Clause is a limitation upon the powers of the Legislature, and does not of its own force apply to the Judicial Branch of government.'" Marcus, 130 S. Ct. at 2165 (quoting Marks v. United States, 430 U.S. 188, 191 (1977)).

found, with respect to the forced labor statute, that there was "no reasonable probability that the jury would have acquitted [the defendant] absent the error." Id. There were two reasons for that conclusion. First, "the Government presented post-enactment evidence sufficient to satisfy the elements of the forced labor statute." Id. Second, the court found "no reasoned basis to differentiate between [the defendant's] pre- and post-enactment conduct, and [it] f[ou]nd no reason to presume that the jury did so." Id. at 43. Additionally, the defendant himself offered no explanation of how his pre- and post-enactment conduct differed in such a way as to create a reasonable probability that the jury would not have convicted him without the due process error.

> The court vacated the sex trafficking conviction, however, stating:

> Unlike with the forced labor charge, the conduct supporting the sex trafficking charge differed materially before and after [the date of enactment], such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings.

Id. at 44. We apply that analysis to Mr. Fishman's due process claim.

Mr. Fishman makes two arguments in support of this claim. First, he argues that, inasmuch as conspiracies for violations of the wire and mail fraud laws, as well as the money laundering laws, do not require proof of an overt act, "the conspiracy is complete upon the agreement itself." Reply Br. of Appellant at 3. As he also puts it, "18 U.S.C. § 1349 is violated upon agreement alone." Id. at 4. Thus, the entire conspiracy was completed before § 1349 went into effect.

-37-

Furthermore, he claims that since the second superseding indictment did not specifically list an overt act occurring post-enactment, his due process rights were also violated because he was convicted of something for which he was never charged.

"'A conspiracy, once instituted, continues to exist until it is abandoned, succeeds, or is otherwise terminated by some affirmative act.'" United States v. Williamson, 53 F.3d 1500, 1513 (10th Cir. 1995) (quoting United States v. Russell, 963 F.2d 1320, 1322 (10th Cir. 1992)). Accordingly, the conspiracy here began with the agreement, but it continued until abandoned, or until it accomplished its mission, or was somehow affirmatively terminated. So we reject Mr. Fishman's argument that the Caribou conspiracy was completed when the initial agreement was made. Additionally, since the conspiracies at issue here do not require proof of overt acts, it is not fatal to the government's case that it does not list a specific overt act in the indictment.

The government concedes that it was error for the district court to fail to instruct the jury on the fact that § 1349 did not come into effect until July 30, 2002. We agree that is an error, which is plain. We must next determine, as did the court in Marcus, whether that error was prejudicial because there is a reasonable probability that the error affected the outcome of the trial. As in Marcus, so too in this case, the government presented "post-enactment evidence sufficient to satisfy the elements of" the conspiracy-to-commit-wire/mail-fraud

statute. Marcus, 628 F.3d at 42. As we have previously indicated, there was, indeed, substantial post-enactment evidence of Mr. Fishman's conduct in furtherance of the worthless bond investment conspiracy.

Additionally, we consider whether there is a "reasoned basis to differentiate between [Mr. Fishman's] pre- and post-enactment conduct." Id. at 43. There is no such basis. The evidence outlined above provides no support for separating the conduct, nor does Mr. Fishman provide us with any persuasive analysis to the contrary. We therefore have no reason to presume that the jury differentiated between the two and convicted him on the basis of pre-enactment conduct only.

In short, while it may have been an error for the district court to have failed to specifically instruct the jury that § 1349 was not effective until part way through the conspiracy, perhaps even a plain error, that error did not affect Mr. Fishman's substantial rights, nor did it affect the fairness of the proceedings. There was substantial evidence that the conspiracy continued long after § 1349 went into effect.

Mr. Fishman alternatively argues that he withdrew from the conspiracy when he began cooperating with authorities. Withdrawal is generally not an available defense to a conspiracy that does not require an overt act. See United States v. Williams, 374 F.3d 941, 950 (10th Cir. 2004) ("Because there is no overt act requirement under the drug conspiracy statute, withdrawal cannot relieve a defendant of criminal responsibility for a conspiracy charged under § 846, though

withdrawal may limit a defendant's liability in situations not relevant here."). But, even in these non-overt act conspiracies, we have agreed that "withdrawal" "may normally start the running of the statute of limitations." Id. n.11. Thus, it can have some relevance even in a non-overt act conspiracy.

So, assuming we are simply considering "withdrawal" in the context of whether it shows Mr. Fishman had abandoned the conspiracy before § 1349 came into effect, we conclude that his cooperation with authorities alone does not necessarily demonstrate that he withdrew. The burden of establishing the abandonment or withdrawal from the conspiracy is firmly on the defendant, Mr. Fishman. See United States v. Fox, 902 F.2d 1508, 1516 (10th Cir. 1990); United States v. Parnell, 581 F.2d 1374, 1384 (10th Cir. 1978) ("In order to withdraw from a conspiracy an individual must take affirmative action, either making a clean breast to the authorities or communicating his withdrawal in a manner reasonably calculated to reach his co-conspirators.").

"Neither arrest nor incarceration automatically triggers withdrawal from a conspiracy." United States v. Gomez, 940 F.2d 1413, 1427 (11th Cir. 1991). Given that there is ample evidence of Mr. Fishman's activities furthering the conspiracy during the time he claims he was cooperating with authorities, he has failed to carry his burden to show that he withdrew from or abandoned or completed the conspiracy before 18 U.S.C. § 1349 went into effect.

Finally, and very significantly, the district court specifically instructed the jury that Mr. Fishman had raised as a defense the claim that he had withdrawn from the conspiracy prior to November 30, 2002. He argued that point to the jury and, by its guilty verdict, the jury found that he had not withdrawn. That jury verdict is amply supported by the record.

## CONCLUSION

For the forgoing reasons, we AFFIRM the conviction and sentence in this case.[15]

---

[15]There were a host of motions filed by both Mr. Fishman and the government, all of which have been referred to us as the merits panel. We address each one in turn: (1) Mr. Fishman filed a motion on 11/23/09 to supplement the record on appeal with the transcript of the deposition of Mr. Henriette, which we grant. (2) The government filed a motion on 5/10/10 to supplement the record with copies of certain exhibits, which we grant. (3) Mr. Fishman filed a motion to strike the government's exhibits involved in the government's 5/10/10 motion to supplement the record (which we just granted), and we deny Mr. Fishman's motion to strike and all other motions relating to these exhibits, as moot. (4) Mr. Fishman filed a motion on 11/29/10 to order and compel J. Lance Hopkins to turn over the case file of Mr. Fishman, which we deny. (5) Mr. Fishman filed a motion on 11/29/10 to view the sealed response of discharged attorney J. Lance Hopkins, which we deny. (6) Mr. Fishman filed a motion on 11/29/10 to strike briefs filed by discharged/withdrawn counsel, which we deny, except we have already stricken the reply brief filed by Mr. Hopkins. (7) Mr. Fishman filed a motion on 11/29/10 to strike the government's brief and for a new briefing schedule, which we deny. (8) The government filed on 12/7/10 responses to Mr. Fishman's motion to strike and to compel Mr. Hopkins, both of which we deny as moot, and any other motions relating to Mr. Fishman's motion to strike and to compel are also denied as moot. (9) Mr. Fishman filed a motion on 12/9/10 to supplement the record on appeal, which we deny as unnecessary. (10) The government filed a response to Mr. Fishman's motion to supplement the record, which we deny as moot. (11) All other pending motions are denied.